2006 WY 4

FRATERNAL ORDER OF EAGLES SHERIDAN AERIE NO. 186, INC., A Non–Profit Organization; Fraternal Order of Eagles Cheyenne Aerie No. 128, Inc., A Non–Profit Organization; and Dream Games of Arizona, Inc., Appellants (Plaintiffs/Petitioners–Intervenors,)

v.

The STATE of Wyoming by and through Jon R. FORWOOD, District Attorney for the First Judicial District; Matthew F. Redle, Sheridan County Attorney, in their official capacities enforcing the criminal laws of the State of Wyoming; the City of Cheyenne, a Municipal Corporation; and Carol Intlekofer, City Clerk, City of Cheyenne, Appellees (Defendants/Respondents).

No. 05–57.

Supreme Court of Wyoming.

Jan. 10, 2006.

Gay Woodhouse and Lori Brand, Gay Woodhouse Law Office, P.C., Cheyenne, Wyoming, for Appellants.

Patrick J. Crank, Wyoming Attorney General; Terry L. Armitage, Senior Assistant Attorney General; and Thomas W. Rumpke, Senior Assistant Attorney General, for Appellees State of Wyoming, Forwood, and Redle.

Michael D. Basom, Cheyenne City Attorney; and Claudia Ryan Angelos, Assistant Cheyenne City Attorney, for Appellees City of Cheyenne and Intlekofer.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, JJ, and PRICE, D.J.

VOIGT, Justice.

[¶ 1] This is an appeal from a district court order finding that certain electronic games do not meet the statutory exclusion for "bingo," and therefore constitute illegal gambling. We affirm.

### ISSUES

[¶ 2] 1. Did the district court apply the appropriate rules for the construction of penal statutes?

2. Did the district court err by ignoring the municipal code of the City of Cheyenne?

3. Were the district court's findings of fact clearly erroneous?

4. Does Wyo. Stat. Ann. § 6–7–101(a)(iii)(D) (LexisNexis 2005) violate the appellants' right to the due process of law?

### STATUTES

[¶ 3] Gambling is prohibited by statute in Wyoming. For many years, the definition of gambling in the prohibitory statute specified "any slot machine, game of faro, monte, roulette, lansquenette, rondo, vingt-un, commonly known as twenty-one, keno, props, or any other game played with cards, dice or other device of whatever nature, for money, checks, credits, or other representatives of value[.]" Wyo. Stat. Ann. § 6–203 (Michie 1957). "Gambling devices" were declared a nuisance, and were subject to seizure and destruction. Wyo. Stat. Ann. § 6–210 (Michie

1957). In a third statute, lotteries and other "schemes of chance" were forbidden, with the following exception: "But nothing in this section shall be construed as applying to games of chance known as raffles or other honest games, and the tickets of such games shall be sold only in this state." Wyo. Stat. Ann. § 6–213 (Michie 1957). In 1971, the "raffles exception" was expanded to read as follows: "But nothing in this section shall be construed as applying to games of chance known as raffles or bingo conducted by charitable or non-profit organizations and the tickets of such raffles or bingo shall be sold only in this state." 1971 Wyo. Sess. Laws Ch. 147, p. 190.

[¶ 4] Wyoming's criminal laws were recodified in 1982, with the relevant gambling statute taking on the following form as Wyo. Stat. Ann. § 6–7–101:

(a) As used in this article:

* * *

(ii) "Gambling" means risking any property for gain contingent in whole or in part upon lot, chance, the operation of a gambling device or the happening or outcome of an event, including a sporting event, over which the person taking a risk has no control, but does not include:

* * *

(D) Raffles or bingo conducted by charitable or nonprofit organizations where the tickets for the raffle or bingo are sold only in this state[.]

1982 Wyo. Sess. Laws Ch. 75, pp. 573–74. Gambling devices continued to be subject to seizure and destruction. *Id.* The gambling statutes have since been amended several times, but not as to the definition of gam-

bling or the bingo exclusion.[1] *See* Wyo. Stat. Ann. § 6–7–101. A "gambling device" continues today to be defined as "any device, machine, paraphernalia or equipment except an antique gambling device that is used or usable in the playing phases of any professional gambling activity, whether that activity consists of gambling between persons or gambling by a person involving the playing of a machine[.]" Wyo. Stat. Ann. § 6–7–101(a)(iv). In relevant part, "professional gambling" means "[a]iding or inducing another to engage in gambling, with the intent to derive a profit therefrom[.]" Wyo. Stat. Ann. § 6–7–101(a)(viii).

## FACTS

### *Procedural Background*

[¶ 5] In 2004, numerous prosecutors in Wyoming either took action, or threatened to take action, to shut down the electronic "bingo" games being conducted in their respective jurisdictions.[2] Several court actions for declaratory relief followed.[3] After consolidation of cases and withdrawal of some parties, the current appellants are the Sheridan and Cheyenne Eagles Aeries and Dream Games of Arizona (Dream Games). Dream Games, a for-profit Arizona corporation, is the manufacturer and owner of the proprietary software and hardware entitled "Fast Action Bingo," the game being conducted by the Eagles Aeries. The current appellees are the State, through its prosecutors in Sheridan and Cheyenne, and the City of Cheyenne.

[¶ 6] After a bench trial, the district court concluded that (1) because profits were shared with "for-profit" entities, the electron-

---

1. In 1983, an exclusion for calcutta wagering was added. 1983 Wyo. Sess. Laws Ch. 105, p. 250. The definition of calcutta wagering was amended in 1985. 1985 Wyo. Sess. Laws Ch. 14, p. 13. In 1986, an exclusion for pull tabs was added. 1987 Wyo. Sess. Laws Ch. 105, p. 216. The advertising of any "gambling activity or event excluded from gambling" was specifically authorized in 1991. 1991 Wyo. Sess. Laws Ch. 211, p. 521. In 1996, dog-sled racing was added to the definition of calcutta wagering. 1996 Wyo. Sess. Laws Ch. 115, p. 384.

2. The word "bingo" appears in quotation marks because "bingo" may not always be "bingo."

3. Plaintiffs have included the Fraternal Order of Eagles Sheridan Aerie No. 186, Inc., Fraternal Order of Eagles Cheyenne Aerie No. 128, Inc., Dream Games of Arizona, Inc., Helping Hand Corporation, West Coast Game Management, Inc., Buffalo Bingo LLC, and Cheyenne Lodge No. 257, Loyal Order of Moose. The list of defendants has included the State of Wyoming, the City of Cheyenne, the Cheyenne City Clerk, and the district or county and prosecuting attorneys from Laramie County, Goshen County, Sheridan County, Platte County, Uinta County, and Sublette County.

ic bingo games were not being conducted by non-profit organizations, and were not, therefore, exempt from the statutory prohibition; (2) electronic bingo machines are illegal gambling devices; and (3) the gambling statutes are not unconstitutional. In reaching those conclusions, the district court relied directly upon our holding in *37 Gambling Devices (Cheyenne Elks Club and Cheyenne Music and Vending, Inc.) v. State*, 694 P.2d 711 (Wyo.1985).

### Glossary

[¶ 7] 1. *Bingo*. Subject to the analysis below, we will begin with a discussion of the general nature of the game called "bingo." In that regard, it must first be said that even "traditional" bingo can be played in a variety of ways and may be known by a variety of names, such as call bingo or session bingo. It is a form of lottery derived from the Italian National Lottery—*Lo Giuoco del Lotto d'Italia*—which has been around since the 16th century. John Scarne, *Scarne's New Complete Guide to Gambling* 208 (Simon and Schuster 1974). The game became popular in the United States during the 1920s. *Id.*, 207–15. Different dictionaries give slightly different definitions of the word "bingo": "A gambling game, resembling lotto, usually with many players." *Webster's New Twentieth Century Dictionary of the English Language Unabridged* 184 (2d ed.1961). "A game resembling lotto or keno, the card used being a grid on which five numbers that are covered in a row in any direction constitute a win, the center square being counted as an already drawn number—called also *beano*." *Webster's Third New International Dictionary of the English Language Unabridged* 217 (1993). "[A] game of chance played with cards having numbered squares corresponding to numbered balls drawn at random and won by covering five such squares in a row; *also:* a social gathering at which bingo is played." *Merriam–Webster's Collegiate Dictionary* 114 (10th ed.1999).

[¶ 8] Those witnesses who testified about session bingo described it as a game played by multiple players who manually mark their individual paper cards in response to random numbers drawn and called as the game progresses. Traditional bingo cards used in session bingo utilize a twenty-five space grid, with the goal being to match the requisite pattern of spaces. There is a winner in every session bingo game, that being the first person to shout "bingo" upon achieving the appropriate pattern. While all agreed that session bingo is a game of chance, they identified an element of skill in it, that being paying attention and timely shouting "bingo." The non-profit organization buys certain supplies and equipment for session or call bingo, but does not pay any portion of the profits to another entity, such as a supplier or distributor. In its findings of fact, the district court described the game as follows: "In traditional session bingo, players purchase bingo cards containing numbers which are to be matched in various patterns (depending upon the game) against numbers on balls drawn randomly from an air hopper. The numbers are called. Players mark the called numbers on their card. Players call 'bingo' when they match the same pattern on their card. First bingo wins."

[¶ 9] 2. *Bonanza Bingo*.[4] In Bonanza Bingo, as played at the Sheridan Eagles Aerie, fifty numbers are selected via a ball hopper or similar device and are posted in some manner. Players purchase sealed cards or tickets which, when opened, reveal a square grid containing twenty—four numbers (five columns of five numbers each, with a center "free" spot).[5] The goal is to obtain a "blackout"—meaning that all twenty-four numbers on the card match numbers previously drawn from the hopper. If no player wins, additional numbers are drawn and added to the original fifty, until there is a winner. Because the numbers are pre-drawn, and because the sealed cards are simply played against those numbers, there is no "session" or "call."[6] The game differs somewhat as

---

4. These terms are being defined with as much precision as possible, given the lack of consensus among the witnesses who testified at the bench trial.

5. This is also the standard face of a traditional session or call bingo card.

6. As the word suggests, "pre-drawn" means that house personnel select the numbers in advance, rather than during the play of the game.

played at the Cheyenne Eagles Aerie.[7] There, the sealed tickets are similar, but only twenty-four numbers are pre-drawn and posted. Apparently, there are several winners each day.

[¶ 10] 3. *Quick Shot Bingo*. The record is not totally clear as to the nature and characteristics of Quick Shot Bingo, or whether there is any distinction between Quick Shot Bingo and Bonanza Bingo. For instance, several exhibits, including player's cards and information sheets, refer to one game as "Quick Shot Bonanza Bingo." Andrew Burns, a Casper "software architect" and bingo program designer, testified that, in Quick Shot Bingo, a player plays sealed cards against twenty-four pre-drawn numbers, with the goal of matching one or more of various predetermined patterns. After identifying several exhibits as Bonanza Bingo or Quick Shot Bingo cards, and one card as a "Quick Shot Bonanza Bingo" card, however, the manager of the Cheyenne American Legion Bingo Hall described Bonanza Bingo as a game where players attempt to get a "cover all" against a pre-drawn set of numbers, and Quick Shot Bingo as a game where players attempt to match particular patterns on sealed cards against a set of pre-drawn numbers.

[¶ 11] Paul Perez owns Dream Games, an electronic bingo software development company, and American Software Development Company, Inc., a distributor of Fast Action Bingo. Mr. Perez testified that "Quick Shot is a Bonanza game." He described Quick Shot Bingo as a game where players purchase cards to play against pre-drawn numbers—a "pre-called" game—with the goal of matching various patterns. He further testified that, in Quick Shot Bingo, twenty-four numbers are pre-drawn, and the cards used have the five-by-five grid with twenty-four numbers described above. A similar description of "Quick Shot Bonanza Bingo" was given by Michelle Tanner, president of Helping Hand Corporation, a non-profit Wyoming corporation that conducts electronic games at several Wyoming locations.

[¶ 12] 4. *Fast Action Bingo*. Paul Perez is the sole officer of the two companies that developed and now distribute an electronic game called Fast Action Bingo. Fast Action Bingo, played at both of the appellant Eagles Aeries, was one of the games subject to the declaratory judgment action below, and it is the sole game at issue in this appeal.

[¶ 13] Perez testified that his association with bingo began in the 1970s, doing volunteer work for one of his mother's charities by "selling papers [and] calling bingo balls." In the mid–1980s, after noting the invention of an electronic aid that allowed handicapped persons to play bingo, Perez developed video software for session bingo. Later, upon becoming familiar with Quick Shot Bingo, which originated during that same decade, Perez contracted with Joseph Zingale, a software programmer, to design a comparable electronic game. That game became Fast Action Bingo.

[¶ 14] In Fast Action Bingo, a central computer operated by employees of a non-profit or charitable organization contains a set of 76,000 player cards, allows for an electronic or manual pre-selection of twenty-four numbers for each game, and keeps track of wins and losses. There is no bingo session or call. Instead, players utilize individual computer screens to play electronic cards against the pre-drawn numbers. Wins are added to the player's credits on the machine, and may be played out as additional games or cashed out in money. Games can be played at different denominations (nickels, dimes, quarters, half-dollars, dollars). The object of each game is to match a particular pattern of numbers. Many games can be played in a few seconds.

[¶ 15] Profits from electronic bingo are shared in various ways between the non-profit organization and Perez's distribution company. The three principal methods of sharing are a percentage of net profit, a weekly rate, or a per-card rate. For the two Eagles Aeries, the arrangement has been a 50/50 split of net proceeds, with net being gross income less player pay-outs. The sec-

---

7. This may simply be a difference in terminology, inasmuch as the Cheyenne Eagles Aerie also conducts a game called "Blackout," which closely resembles the Sheridan Eagles Aerie's "Bonanza Bingo."

retary of the Sheridan Eagles Aerie testified that the Aerie netted about $8,000 per month from Fast Action Bingo, and that 20% of the Aerie's share goes to charity. The remaining 80%—about $6,400—is used "mostly [to] pay our bills." In comparison, the president of the Cheyenne Eagles Aerie testified that it netted about $4,000-$4,500 monthly, of which 10% to 20% went to charity.

## DISCUSSION

### Did the district court apply the appropriate rules for the construction of penal statutes?

[¶ 16] We recently restated our standard for reviewing decisions involving statutory construction:

This court interprets statutes by giving effect to the legislature's intent.... We begin by making an inquiry relating to the ordinary and obvious meaning of the words employed according to their arrangement and connection.... We give effect to every word, clause, and sentence and construe together all components of a statute in *pari materia.* ... Statutory interpretation is a question of law.... We review questions of law *de novo* without affording deference to the district court's decision. *Worcester v. State,* 2001 WY 82, ¶ 13, 30 P.3d 47, 52 (Wyo.2001). If a statute is clear and unambiguous, we simply give effect to its plain meaning. *Wesaw v. Quality Maintenance,* 2001 WY 17, ¶ 13, 19 P.3d 500, 506 (Wyo.2001) (quoting *In re Claim of Prasad,* 11 P.3d 344, 347 (Wyo. 2000)). Only when we find a statute to be ambiguous do we resort to the general principles of statutory construction. *Wesaw,* 2001 WY 17, ¶ 13, 19 P.3d at 506 (quoting *In re Claim of Prasad,* 11 P.3d at 347). An ambiguous statute is one whose meaning is uncertain because it is susceptible to more than one interpretation. *Pierson v. State,* 956 P.2d 1119, 1125 (Wyo. 1998) (quoting *Amrein v. State,* 836 P.2d 862, 864–65 (Wyo.1992)).

It is a basic rule of statutory construction that courts may try to determine legislative intent by considering the type of statute being interpreted and what the legislature intended by the language used, viewed in light of the objects and purposes to be accomplished....

We are guided by the full text of the statute, paying attention to its internal structure and the functional relation between the parts and the whole. *In re Worker's Compensation Claim of Johnson,* 2001 WY 48, ¶ 8, 23 P.3d 32, 35 (Wyo.2001) (quoting *In re Hernandez,* 8 P.3d 318, 321 (Wyo.2000) and *Parker Land and Cattle Co. v. Wyoming Game and Fish Com'n,* 845 P.2d 1040, 1045 (Wyo.1993)). Each word of a statute is to be afforded meaning, with none rendered superfluous. *Jessen v. Burry,* 13 P.3d 1118, 1120 (Wyo. 2000). Further, the meaning afforded to a word should be that word's standard popular meaning unless another meaning is clearly intended. *Soles v. State,* 809 P.2d 772, 773 (Wyo.1991). If the meaning of a word is unclear, it should be afforded the meaning that best accomplishes the statute's purpose. *Radalj v. Union Savings & Loan Ass'n,* 59 Wyo. 140, 138 P.2d 984, 996 (1943).

*Union Pacific Resources Company v. Dolenc,* 2004 WY 36, ¶ 13, 86 P.3d 1287, 1291–92 (Wyo.2004) (*quoting Rodriguez v. Casey,* 2002 WY 111, ¶¶ 9–10, 50 P.3d 323, 326–27 (Wyo.2002)).

[¶ 17] The specific allegation in the instant case is that the district court failed to apply the "rule of lenity" in construing the gambling statutes, which the appellants characterize as penal statutes. They cite *Demeulenaere v. State,* 995 P.2d 132, 135 (Wyo.2000) and *Meerscheidt v. State,* 931 P.2d 220, 224 (Wyo.1997) for two propositions: (1) penal statutes are to be strictly construed and cannot be enlarged by implication or extended by inference; and (2) any ambiguity in a penal statute must be resolved in favor of the person against whom the statute is being applied.

[¶ 18] We will summarily affirm the district court on this issue. To begin with, neither party contends that the statutes are ambiguous, and the district court did not find them to be ambiguous. We agree. And without ambiguity, statutory construction is inappropriate. Thus, the rule of lenity that

applies to penal statutes, being a rule of statutory construction, has no role to play. *See Abeyta v. State,* 2002 WY 44, ¶ 9, 42 P.3d 1009, 1012 (Wyo.2002); *Umbach v. State,* 2002 WY 42, ¶ 9, 42 P.3d 1006, 1008 (Wyo. 2002); *Meerscheidt,* 931 P.2d at 224; *Matter of ALJ,* 836 P.2d 307, 310 (Wyo.1992) (rule of lenity applicable only to extent ambiguity exists). If a statute is plain and unambiguous, we simply give effect to its plain meaning. *Hede v. Gilstrap,* 2005 WY 24, ¶ 6, 107 P.3d 158, 162 (Wyo.2005). Secondly, even assuming that the gambling statutes are penal in nature, and assuming that construction was necessary, we would construe the exclusion narrowly. *37 Gambling Devices,* 694 P.2d at 719. That is because the strong public policy embodied in the statutes focuses upon the illegality of gambling, not upon the legality of bingo. *See Citation Bingo, Ltd. v. Otten,* 121 N.M. 205, 910 P.2d 281, 287 (1995). And finally, the rule of lenity does not apply because the gambling statutes are more remedial than punitive in nature. *See* Norman J. Singer, 3 *Sutherland Statutory Construction,* Chapters 59–60 (6th ed.2001).

### Did the district court err by ignoring the municipal code of the City of Cheyenne?

[¶ 19] The City of Cheyenne has enacted an ordinance entitled "Bingo and Pull Tabs," the stated purpose of which is to "regulate, license, and monitor the conduct of games of chance known as bingo and pull tabs[.]" *Cheyenne City Code,* § 5.32.010. Contained within that ordinance, at § 5.32.020, is the following definition of bingo:

"Bingo" means a game of chance in which:

1. Winning chances are determined by random selection of a subset of numbers, designators or objects numbered, lettered or otherwise designated by some medium among a total set of numbers, designators or objects numbered, lettered or otherwise designated by some medium;

2. The card(s) held by the player by which a winner(s) is associated is sold, rented or used only at the time and place of the gaming activity;

3. "Bingo" does not mean or include an activity which is prohibited under Wyo. Stat. Section 6–7–101(a)(iii)(D).

[¶ 20] A copy of the city ordinance was admitted into evidence during the bench trial. On appeal, the appellants contend that the district court "ignored the valid definitions for statutory terms found in Defendant City of Cheyenne's bingo ordinances and thus overturned valid enactments with the force and effect of law...." They cite *Distad v. Cubin,* 633 P.2d 167, 176 (Wyo.1981), wherein it was held that "rules and regulations adopted pursuant to statutory authority and when properly promulgated have the force and effect of law." The appellants' specific argument is that, in the absence of a legislative definition of bingo in the statutes, "a lawful municipal enactment should prevail over an unenacted dictionary definition—especially one edited and then adopted out of the blue by the District Court."

[¶ 21] This issue amounts to a contention that the district court misapplied the law in construing the statute. We have already noted that statutory interpretation is a question of law that is reviewed *de novo. Union Pacific Resources Company,* 2004 WY 36, ¶ 13, 86 P.3d at 1291. Furthermore, challenges to conclusions of law after a bench trial, including allegations that factual findings were induced by an erroneous view of the law, or by application of an improper legal standard, are subject to *de novo* review on appeal. *Piroschak v. Whelan,* 2005 WY 26, ¶ 7, 106 P.3d 887, 890 (Wyo.2005); *Cross v. Berg Lumber Co.,* 7 P.3d 922, 928 (Wyo. 2000).

[¶ 22] Although it is somewhat difficult to follow, the appellants' full-circuit argument appears to be as follows: (1) all sorts of bingo games have been played across the state for many years, including within the City of Cheyenne; (2) the City of Cheyenne has an ordinance in which bingo is defined; (3) inasmuch as the City of Cheyenne has not endeavored to shut down bingo in any of its various forms, the term "bingo" must encompass "all forms and mediums of the game of bingo"; (4) there is no statutory definition of bingo; (5) therefore, the district court, and

by implication, this Court, must apply the City's definition to the State's statutory term.

[¶ 23] We decline to adopt this line of reasoning, primarily because there is no legal authority for its central thesis. That is, the appellants provide no authority for the proposition that, in giving effect to the plain meaning of a statute, courts are bound to apply a definition adopted by a local municipality in its ordinances. *Distad* certainly does not say that. *Distad* was a wrongful death/medical malpractice case involving questions about the standard of care, wherein we held that "rules or regulations having the force and effect of law will be treated as contemplated by the parts of the Restatement we adopt in considering whether they should be embraced as standards of conduct in tort actions." *Distad,* 633 P.2d at 176. There is a large gap between that holding and the appellants' contention.[8] Furthermore, inasmuch as the statutes are not ambiguous, we need not reach out to a municipal ordinance for guidance in interpreting those statutes.

### Were the district court's findings of fact clearly erroneous?

[¶ 24] We review the findings of fact of a district court after a bench trial under the following standard:

> The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Harber v. Jensen,* 2004 WY 104, ¶ 7,

97 P.3d 57, ¶ 7 (Wyo.2004) (quoting *Life Care Centers of America, Inc. v. Dexter,* 2003 WY 38, ¶ 7, 65 P.3d 385, ¶ 7 (Wyo. 2003)). Findings may not be set aside because we would have reached a different result. *Harber,* ¶ 7 (citing *Double Eagle Petroleum & Mining Corp. v. Questar Exploration & Production Co.,* 2003 WY 139, ¶ 6, 78 P.3d 679, ¶ 6 (Wyo.2003)). Also, in reviewing a trial court's findings of fact, we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it. We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law. *Harber,* ¶ 7 (quoting *Life Care Centers,* ¶ 7). We affirm the trial court's findings if there is any evidence to support them. *Id.*

*Piroschak,* 2005 WY 26, ¶ 7, 106 P.3d at 890–91. The party claiming that its conduct falls within an exception to a statutory prohibition bears the burden of proving that proposition. 73 Am.Jur.2d *Statutes* § 212 (2001); 2A *Sutherland Statutory Construction* § 47:11 (2000).

[¶ 25] The appellants contend that sixteen of the district court's findings of fact are clearly erroneous. Their claims can be categorized as follows:

1. In Finding Nos. 22, 23, 26, 29, 30, 43 and 44, the district court failed to recognize that Bonanza Bingo and Quick Shot Bingo are the same game.

2. In Finding Nos. 25(c) and 27, the district court failed to recognize that, in Fast Action Bingo, a printer option allows for the production of paper cards that a player may daub manually, which incorporates a skill element into the game.

3. In Finding No. 42, the district court erroneously concluded that Helping

---

8. During oral argument, the appellants also cited *Snake River Brewing Company, Inc., v. Town of Jackson,* 2002 WY 11, ¶ 8, 39 P.3d 397, 403 (Wyo.2002). Like *Distad,* however, *Snake River Brewing* provides no authority for the appellants'

position. The salient, though irrelevant, point of the latter case is that, in the law of municipal planning and zoning, "[t]he comprehensive plan is the policy statement; the zoning ordinances are what have the force and effect of law." *Id.*

Hand's Double Up Bingo is substantially the same as Fast Action Bingo.

4. In Finding No. 25(h), the district court erred in finding that, in Fast Action Bingo, the pre-selected numbers are entered into the machine before the cards are selected by the machine. The appellants contend that, to the contrary, the same set of 76,000 player cards is stored in the machine, but they are not individually daubed until played.[9]

5. In Finding Nos. 14, 21, 26, 28, 29, 31, 43, and 44, the district court erroneously limited the term "traditional bingo" to refer only to session bingo, when the term also should include Bonanza/Quick Shot Bingo, which has been played throughout Wyoming for twenty years.

6. In Finding Nos. 25(g), 25(i), 26, 27, 28, 29, 30, 43, and 44(a)-(d), the district court erroneously adopted the appellees' alleged "bingo elements," even though such elements are not included in the definition of bingo adopted in Conclusion No. 6.

7. Finding Nos. 31, 32, 44(d), and 45(a)-(e) reflect the district court's legal error in considering the potential for manipulation as a factor in determining that Fast Action Bingo is gambling. The statute contains no such factor, and penal statutes must be strictly construed. Furthermore, there was no evidence at trial that Fast Action Bingo games were subject to manipulation.

[¶ 26] Before we deal directly with these findings of fact, we will discuss *37 Gambling Devices,* the 1985 case that was relied upon by the district court. In that case, officers of the Cheyenne Police Department had seized from the Cheyenne Elks Club several machines and other devices that allegedly were being used for gambling. Among the items seized were "two electronic machines identified as Shawnee games [and] an electronic bingo game." *37 Gambling Devices,* 694 P.2d at 714. In affirming the district court's conclusion that these machines were gambling devices, we said the following:

> With regard to the three electronic machines which were seized, it is clear from the record that these machines were being operated as gambling devices, although unlike the standard slot machines there was no automatic payoff. Instead, those playing the machines were paid in cash by the bartender with the amount of payment depending upon their success in playing the games. See *State v. Branney,* 62 Wyo. 40, 160 P.2d 972 (1945). It also is established by evidence in the record that these machines were being operated for profit by Elk's Lodge Number 660, and the owner of the machines, Cheyenne Music and Vending Company, Inc. The net proceeds from the operation of the machines was divided between these two entities on a fifty-fifty basis. Cheyenne Music and Vending Company, Inc., concedes that it is organized and operated as a profit-making venture. That fact, as well as the failure of the proof relating to the nonprofit status of the Elk's Lodge, prevents any application of the statutory exception to these particular machines.

*Id.* at 717. That is, and was, a correct statement of the law. We continue to believe, and we find that the district court was correct in concluding, that the legislature did not intend the bingo exclusion, purposely restricted to games conducted by charitable or non-profit organizations, to extend to games in which the profits go, in anything more than an incidental fashion, to a profit-making person or organization.

[¶ 27] While that could, perhaps, be the end of this matter, we will provide further guidance with some additional comments. In *37 Gambling Devices,* 694 P.2d at 717–718, we went on to quote the following language from an Illinois appellate court faced with a similar challenge:

> "The law is not required to be blind to, and ineffectual against, the ceaseless efforts

---

9. This argument seems to be a misconstruction of the finding. We assume the "pre-selected" numbers referenced in the finding are the 24 pre-drawn numbers, not the individual player card numbers.

and ingenuity of persons to circumvent the Gambling Device Act. When we ascend to the bench we do not discard the ordinary common sense observations, experiences and intelligence of common men and we cannot be so naive as to conclude that the devices which have been demonstrated to us are games of amusement. * * *" *People v. One Machine Known as "Circus Days"*, 23 Ill.App.2d 480, 163 N.E.2d, 223, 228 (1960).

[¶ 28] The lesson for us today in that quotation is that we are to apply common sense in determining whether the game and equipment making up Fast Action Bingo are the equivalent of the "bingo" that was excluded from the definition of illegal gambling in 1971. In *37 Gambling Devices*, 694 P.2d at 718, we performed that exercise in another section of the opinion dealing with the question of whether "pickle cards" were "raffles," which, like bingo, were excluded from the definition of gambling. We did so simply by comparing their characteristics in the context of the common and ordinary meaning of "raffle." That process went as follows:

> The common and ordinary use of the term "raffle" would not include a game of chance such as the pickles game. Unlike the usual raffle conducted by a charitable or nonprofit organization, pickles cards are marked by symbols which when revealed and compared to a pre-existing chart determine whether the purchaser is a winner. In a raffle the probability of any individual ticket being randomly drawn to win a prize is equal and determined by the total number of tickets actually sold, whereas in the pickles game a predetermined number of cards is to be sold with a predetermined number of winners.

In a passage implying strict construction of the raffles and bingo exclusion, we then voiced our assumption that, in crafting the exclusion, the legislature "carefully chose" its limitations, and did not intend to exclude "all lotteries or schemes of chance, 'of any kind

or description, by whatever name, style, or title the same may be known' which might be conducted by" eligible organizations. *Id.* at 719.

[¶ 29] Following a similar thought process, the Supreme Court of Kansas concluded in *State ex rel. Stephan v. Parrish*, 256 Kan. 746, 887 P.2d 127 (1994) that the Kansas Constitution did not allow the Kansas Legislature statutorily to legalize pull tabs.[10] After considering that state's constitutional and statutory framework, the many and varied dictionary definitions of bingo, and other cases that have dealt with similar issues,[11] that court declared:

> We agree with the Secretary and the Intervenor, and the State does not seriously contend otherwise, that the terms "games of bingo" in Art. 15, § 3a may logically be construed to mean more than the traditional game of bingo familiar to nearly everyone and as originally defined in the Bingo Act. However, we think it is beyond fair dispute that games of bingo which depart from the general understanding of traditional bingo must fall within the same general category of games and have the basic characteristics common to all such games.
>
> * * *
>
> In reviewing the numerous definitions of bingo and bingo-type games submitted by industrious counsel, there are definite characteristics common to and inherent in bingo-type games. All definitions include the requirement of a card or paper utilizing numerous numbers which are to be covered or marked if and when one of the numbers is drawn by lot and announced by a caller or selected through some other similar method. Bingo-type games contemplate a group activity, often social, with several participants. The object of the game is to be the first to complete the pattern prescribed for that particular bingo-type game from the numbers called. Instant bingo utilizes a small pull tab card where the activity may be only one on one

---

10. In a blatant attempt to meet the constitutional mandate, pull tabs were called "instant bingo" in the legislation. *Stephan*, 887 P.2d at 129.

11. *See City of Piedmont v. Evans*, 642 So.2d 435 (Ala.1994); and *People v. 8,000 Punchboard Card Devices*, 142 Cal.App.3d 618, 191 Cal.Rptr. 154 (1983).

between the player and the seller of the card. As such, it does not have the group participation required of bingo-type games.

In bingo, each game lasts several minutes with the participants hoping to be the first to complete a winning line on their cards. In instant bingo the result is instantaneous with the pulling open of the tab or tabs which will reveal whether the player has won or lost. The basic elements or characteristics of games of bingo, as generally understood and as defined by knowledgeable authorities, are totally lacking in instant bingo. In fact, instant bingo has characteristics far more similar to slot machines, punchboards, and other forms of gaming rather than to bingo-type games. *Id.* at 134–37.

[¶ 30] The evidence adduced at trial gives us a clear history of bingo in Wyoming. Traditionally, the game played was session or call bingo. No doubt, that is what the legislature had in mind when it legalized bingo in 1971. We say "no doubt" because there is no evidence in the record that any other bingo-type game was being played in Wyoming before that date. Once bingo conducted by non-profit organizations became legal, however, industrious minds came up with ways to play more games, to play them faster, and to raise the stakes.[12] Games such as Bonanza Bingo and Quick Shot Bingo came into Wyoming during the 1980s, well after the 1971 legislation. Numbers now were pre-drawn and pre-posted, no session was necessary, no caller was necessary, and winning and losing cards were instantly identifiable. The next step, following technology, was "electronic bingo." Interestingly enough, Wyoming was the first state into which Fast Action Bingo was introduced.

[¶ 31] The appellants contend that their electronic games are simply Bonanza Bingo and Quick Shot Bingo in another form. The bulk of the evidence at trial, and the bulk of the argument below and here, has been directed toward a comparison of Bonanza Bingo and Quick Shot Bingo, coupled with a comparison of the games of *paper* Bonanza

Bingo and Quick Shot Bingo and *electronic* Bonanza Bingo and Quick Shot Bingo. It is in the context of these comparisons that the appellants challenge the district court's findings of fact. Neither of these, however, is the significant comparison. The significant comparison is that between traditional bingo and Fast Action Bingo. We conclude that, while getting unnecessarily entangled in the comparison of Bonanza Bingo and Quick Shot Bingo, the district court found and concluded correctly in the end that the specific electronic game, Fast Action Bingo, was not similar in nature to the game of bingo excluded from gambling in 1971.

[¶ 32] As of 1971, bingo was played simultaneously by a number of people, all of whom watched and waited as numbers were called one-by-one as drawn, and all of whom were attempting to beat each other to "bingo." When someone obtained the winning pattern, he or she shouted "bingo" and was awarded the common prize sought by all players. That game was then over. Contrast that with a game where a lone player sits down to face a machine. Winning numbers have been pre-drawn for the day, or the week, and electronic game cards are simply compared to those numbers. Available games left to play are characterized as credits on the machine. Such credits may be played or paid. While all the players' monitors are networked to the organization's terminal, the players are playing in isolation, and if one player wins, that does not end the game for other players. Wins and losses are instantaneous, and it takes only a few seconds to play a game. Andrew Burns, who designed Double Up Bingo for Helping Hand, testified that, in electronic bingo, the game—that is, the matching of the cards against the numbers—takes place within the server, not even within the player's terminal. In session bingo, of course, the matching takes place on the player's card.

[¶ 33] Fast Action Bingo simply does not bear even a remote resemblance to traditional bingo—the game of bingo envi-

---

**12.** Michelle Tanner testified that a player can now win a maximum of $2,400 on one play on

Helping Hand's video machines.

sioned by the legislature in 1971. Even the appellants' witnesses provided testimony showing that the standard and popular meaning of the word "bingo," as used in the 1971 statute, is traditional session bingo. Michelle Tanner, Helping Hand's president, testified that when she started playing bingo in the basement of a church around 1970, the game was played with "hard cards," a caller using a "squirrel cage," and numbers called out as players marked their cards.[13] Similarly, Susan Hall, the manager of the Cheyenne American Legion Bingo Hall, admitted that, to her friends, "let's go play bingo" means session bingo. That is the common meaning of "bingo."

[¶ 34] In reviewing the district court's findings of fact and conclusions of law, our task is not merely to determine whether any of the factual findings are clearly erroneous. Rather, our ultimate goal is to determine whether the legal conclusions are sustained by findings that are supported by the evidence. We began that process with a detailed review of the record, as revealed in the discussion above. We will now address the groups of findings that the appellants contend are clearly erroneous.

[¶ 35] The appellants argue first that, in numerous findings, the district court failed to recognize that Bonanza Bingo and Quick Shot Bingo are the same game. While it is true that some testimony and some exhibits indicated that these are simply different names for one game, it is also true that some witnesses considered them to be distinct. We cannot say that, given this state of the evidence, the district court's findings were clearly erroneous. Furthermore, in light of the analysis set forth above, the distinction, if any, between the two games is irrelevant. Because of its very nature, Fast Action Bingo is just not statutory bingo, and that conclusion does not depend upon any comparison of Bonanza Bingo and Quick Shot Bingo. The same can be said of the appellants' claim that the district court erred in finding Fast Action Bingo to be substantially the same as Helping Hand's Double Up Bingo.

13. "Hard cards" were cardboard cards, sometimes with a shutter mechanism with which to

[¶ 36] The appellants next argue that the district court failed to recognize that Fast Action Bingo allows for a player's cards to be printed out, rather than to be played on the machine, thereby giving Fast Action Bingo the same element of skill found in traditional bingo, where the player must mark his or her card. In other words, a Fast Action Bingo player *could* print out the card and then compare the numbers shown on it to the pre-drawn set of numbers. While that may be true, it does not change the fundamental nature of the game—man against machine. Beyond that, nobody testified to what extent, if any, such printed cards actually are used in electronic bingo. As to the skill aspect, Susan Hall and Andrew Burns testified that a person can miss a number playing session bingo, but not playing electronic bingo.

[¶ 37] In several findings of fact, the district court described features of electronic bingo that created the "possibility" of "result manipulation." In particular, the fact that numbers are pre-drawn means that, when a player selects a terminal and purchases electronic cards, those cards could be selected by the computer "with reference to the selected numbers." The appellants contend that this finding is clearly erroneous, for two reasons: first, there was no evidence that Fast Action Bingo games were subject to manipulation, and second, no definition of bingo presented to or adopted by the district court contained an element concerning susceptibility to manipulation.

[¶ 38] We agree with the appellants that this finding was not supported by the evidence and is, therefore, clearly erroneous. The software experts who testified both described electronic bingo programs dependent upon random number generators. Their resolute defense of random number generators was not successfully challenged, and no evidence of actual manipulation was presented. However, because there was other sufficient evidence supporting the district court's ultimate conclusion, this error was not prejudicial. We can affirm the district court

mark numbers.

upon any valid basis appearing in the record. *37 Gambling Devices,* 694 P.2d at 717.

[¶ 39] The appellants next identify eight separate findings in which they allege that the district court limited the term "traditional bingo" to session bingo, thereby erroneously omitting Bonanza Bingo and Quick Shot Bingo. This allegation has, of course, been central to much of the foregoing discussion. The district court did not err. As we stated above, the district court may have ventured unnecessarily deep into investigating the finer distinctions between Bonanza Bingo and Quick Shot Bingo, but it did not lose track of the central inquiry into whether Fast Action Bingo fits the common and ordinary meaning of the word "bingo" as used in the statutes. In determining that it does not, the district court correctly compared the nature of traditional bingo to the nature of the electronic game. It was not incumbent upon the district court also to compare Fast Action Bingo to every modern game to which some manufacturer might affix the appellation "bingo." The appellants believe Bonanza Bingo and Quick Shot Bingo are "traditional" because they have been around for twenty years or so. However, while players today may consider them "bingo games," because that is what they are called by their creators, they are not, *ipso facto,* "traditional bingo." They simply differ too much from traditional session bingo.

[¶ 40] Finally, the appellants contend that the district court erroneously adopted certain "bingo elements," where the evidence did not support those elements and where they were not part of the definition of bingo adopted in the conclusions of law. Those identified elements are: (1) there is a winner in every game; (2) players compete against one another; (3) there is a skill and attentiveness aspect in marking the cards and timely shouting "bingo"; and (4) there is no opportunity for manipulation in the selection of a player's cards.

[¶ 41] We begin our discussion of these contentions with the observation that we do not perceive the questioned findings as the district court's attempt to describe a finite set of "elements" that make up the game of bingo. Rather, we perceive these findings as the district court's reference to evidence that was adduced by the parties in their efforts to contrast traditional bingo and Fast Action Bingo. The district court simply pointed out characteristics of the two games. The question is whether the stated findings are supported by the evidence. Our review of the evidence indicates that they are.

[¶ 42] At least three witnesses—Valdez, Wigt, and Zingale—testified that there is a winner in every game of traditional bingo. Indeed, Zingale stated that the nature of the game requires such. This is sufficient evidence from which the district court could make the questioned finding of fact. As to the competitive nature of traditional bingo, Calkins, Hall, and Wigt testified that players are playing against one another in the sense that "you have to yell 'bingo' " before anyone else does. Although witness Valdez insisted that traditional bingo players do not compete against each other, he did concede the necessity of being the first player to announce a bingo. Once again, we cannot say that the district court was clearly erroneous in finding that players compete against one another in traditional bingo.

[¶ 43] The third characteristic of traditional bingo found by the district court is the attentiveness and skill required accurately to mark one's playing card as numbers are called and to shout out "bingo" at the appropriate time. This skill requirement was nearly universally recognized by all the trial witnesses. Witness Hall underscored the skill concept by noting the difficulty of keeping track of multiple cards, by noting that you do not win if you miss a number, and by admitting that she, herself, had missed numbers called during a traditional bingo session. The evidence clearly supported this finding of fact.

[¶ 44] As to the fourth characteristic of traditional bingo identified by the district court—that it is not subject to manipulation—we have already discussed above the lack of any evidence to support the mirror finding that electronic bingo *is* subject to manipulation. Because there is a similar dearth of evidence suggesting that traditional bingo *is not* subject to manipulation, we conclude that the district court's finding to that

effect is clearly erroneous. Counsel's implications through questions are not the equivalent of testimony.

[¶ 45] With this one exception, the district court's findings of fact were not clearly erroneous. Furthermore, those findings support the district court's legal conclusions. Specifically, the evidence clearly showed the vast differences between traditional bingo and Fast Action Bingo. The latter is illegal because it is not the game of bingo excepted from the statutory ban and because it utilizes gambling devices to induce people to gamble, with Dream Games' intent of deriving a profit therefrom.

### Does Wyo. Stat. Ann. § 6-7-101(a)(iii)(D) violate the appellants' right to the due process of law?

[¶ 46] A statute may be challenged as unconstitutionally vague "on its face" or "as applied." To prove a facial challenge, the challenger must show either that the statute reaches a substantial amount of constitutionally protected conduct, or that it specifies no standard of conduct at all. To prove an as-applied challenge, the challenger must show that the statute provides insufficient notice to a person of ordinary intelligence that the challenger's conduct was illegal. See Moe v. State, 2005 WY 58, ¶ 9, 110 P.3d 1206, 1210 (Wyo.2005); Giles v. State, 2004 WY 101, ¶ 15, 96 P.3d 1027, 1031 (Wyo. 2004); and Browning v. State, 2001 WY 93, ¶¶ 10–11, 32 P.3d 1061, 1066 (Wyo.2001). A statute specifies a standard of conduct if, by its terms or as authoritatively construed in prior opinions, it applies without question to certain activities, even though its application to other activities is uncertain. Pine v. State, 2001 WY 133, ¶ 13, 37 P.3d 368, 372 (Wyo.2001); Browning, 2001 WY 93, ¶ 11, 32 P.3d at 1066; and Saiz v. State, 2001 WY 76, ¶ 9, 30 P.3d 21, 24 (Wyo.2001). In determining whether a statute provides sufficient no-

tice, we consider the plain and ordinary meaning of the words used in the statute, any prior court decisions that have construed the statute, and whether the statute has been previously applied to conduct identical to that of the appellant. Giles, 2004 WY 101, ¶ 23, 96 P.3d at 1035; Saiz, 2001 WY 76, ¶ 13, 30 P.3d at 26; and Lovato v. State, 901 P.2d 408, 412 (Wyo.1995). "The ultimate test under a vagueness challenge is whether a person of ordinary intelligence could read the statute and comprehend what conduct is prohibited." Campbell v. State, 999 P.2d 649, 657 (Wyo. 2000).

[¶ 47] We apply the following standards when determining the constitutionality of challenged statutes:

"Issues of constitutionality present questions of law. We review questions of law under a de novo standard of review and afford no deference to the district court's determinations on the issues. Anderson v. Bommer, 926 P.2d 959, 961 (Wyo.1996). In reviewing a constitutionally based challenge to a statute, we presume the statute to be constitutional and any doubt in the matter must be resolved in favor of the statute's constitutionality. Thomson v. Wyoming In Stream Flow Committee, 651 P.2d 778, 789–90 (Wyo.1982). [Appellant] bears the burden of proving the statute is unconstitutional. Pfeil v. Amax Coal West, Inc., 908 P.2d 956, 961 (Wyo.1995)."

Reiter v. State, 2001 WY 116, ¶ 7, 36 P.3d 586, 589 (Wyo.2001) (quoting V–1 Oil Co. v. State, 934 P.2d 740, 742 (Wyo.1997)). See also Browning, 2001 WY 93, ¶ 12, 32 P.3d at 1066; Saiz, 2001 WY 76, ¶ 10, 30 P.3d at 24; and Campbell, 999 P.2d at 657. The appellant's burden of proof is heavy, and it includes the obligation to show both that he has a constitutionally protected interest and that it has been infringed in an impermissible way.[14] Woods v. Wells Fargo Bank Wyo-

14. The appellants identified the constitutional right being infringed by the current prosecution as "their constitutional right to earn a living or fundraise." We assume that the former—earn a living—refers to Dream Games, and the latter—fundraise—refers to the Eagles Aeries. The questions presented by this claim—whether there is a constitutional right to earn a living by gambling

and whether there is a constitutional right for non-profit organizations to raise funds—are not developed by the parties. Without deciding those questions, we will assume for the purposes of this case that there is a constitutionally protected right not to be convicted of a criminal offense under a statute that is vague as applied. Even without the due process argument, of

*ming,* 2004 WY 61, ¶ 53, 90 P.3d 724, 739 (Wyo.2004); and *Meyer v. Norman,* 780 P.2d 283, 289 (Wyo.1989).

[¶ 48] The appellants' contention on appeal is that the district court erred in its analysis of their constitutional challenge. That analysis, which is contained in Conclusion of Law Nos. 10–15, may be summarized as follows:

1. A statute, even if ambiguous, is not unconstitutionally vague unless it requires a person to guess at its meaning. *Shunn v. State,* 742 P.2d 775, 777 (Wyo.1987).

2. A person raising a constitutional vagueness challenge must show that the statute is impermissibly vague in all of its applications. *Alcalde v. State,* 2003 WY 99, ¶ 15, 74 P.3d 1253, 1261 (Wyo.2003).

3. When evaluating a statute to determine whether it provides sufficient notice to an appellant, the court must consider not only the statutory language, but also any prior court decisions that have placed a limiting construction on the statute or that have applied it to specific conduct. *Giles,* 2004 WY 101, ¶ 23, 96 P.3d at 1035.

4. The dual holdings in *37 Gambling Devices* that the electronic games were illegal gambling devices and that the sharing of profits therefrom with a for-profit entity took the activity outside the exception for non-profit organizations, provided sufficient notice to the appellants that Fast Action Bingo was illegal, thereby defeating their vagueness challenge.[15]

5. Therefore, the statute is not unconstitutional.

[¶ 49] The appellants contend that this analysis is flawed because it "does not comport with the facts." They then state the relevant facts to be as follows: (1) the appellants' conduct is not equivalent to that of the appellants in *37 Gambling Devices;* (2) Fast Action Bingo had not been invented when *37 Gambling Devices* was decided; (3) people have been playing Bonanza Bingo and Quick Shot Bingo throughout Wyoming for the past 20 years; (4) the City of Cheyenne has ordinances interpreting the gambling statutes and regulating bingo; (5) the present prosecutions are the appellants' first notice that the State considers Fast Action Bingo to be illegal; and (6) the present prosecutions demonstrate that men of ordinary intelligence must guess as to the meaning of the statute.

[¶ 50] Wyo. Stat. Ann. § 6–7–101(a)(iii)(D) excludes raffles and bingo from the statutory definition of gambling. The wording of the exclusion is as follows: "[B]ingo conducted ... by charitable or nonprofit organizations where the tickets ... are sold only in this state[.]" The appellants contend that this language violates their right to the due process of law because it is void for vagueness. Specifically, citing *Sanchez v. State,* 567 P.2d 270, 274 (Wyo.1977); and *State v. Gallegos,* 384 P.2d 967, 968 (Wyo. 1963), they argue that the statute is void for vagueness because men of common intelligence must necessarily guess at its meaning and differ as to its application. Further, they cite *Armijo v. State,* 678 P.2d 864, 868 (Wyo.1984), for the proposition that criminal statutes must set forth with reasonable certainty the act or conduct required or forbidden in a manner that furnishes fair notice to a person of ordinary intelligence that certain conduct is proscribed by the State. Finally, the appellants also contend that they were victims of arbitrary and discriminatory enforcement of the statute.

[¶ 51] Our first order of business in reviewing a statute for vagueness is to determine whether the challenge is a facial challenge. *Luplow v. State,* 897 P.2d 463, 466 (Wyo.1995); and *McCone v. State,* 866 P.2d 740, 745 (Wyo.1993). We have carefully reviewed the record and the appellate briefs

course, the appellants would have standing to challenge the statute under the Uniform Declaratory Judgments Act, Wyo. Stat. Ann. § 1–37–101 *et seq.* (LexisNexis 2005).

**15.** This fourth conclusion is implicit, rather than explicit, in the district court's order. The only way the court could have gone from the third conclusion to the fifth conclusion is by way of this fourth conclusion.

and, despite references here and there to a facial challenge, the appellants actually have only challenged the statute as it applies to their conduct. They have not attempted to demonstrate either that the statute reaches a substantial amount of constitutionally protected conduct or that it specifies no standard of conduct at all. In their reply brief, they chastise the appellees for having misstated the law by citing facial vagueness cases in response to appellants' as-applied due process challenge. Furthermore, during oral argument, the appellees stated without contradiction from the appellants that the appellants had abandoned any facial challenge to the gambling statute. Judging from the record and the parties' briefs, that observation appears to be correct. Consequently, we will address only the as-applied challenge.

 [¶ 52] An as-applied challenge alleges that the statute does not provide sufficient notice to the appellant that his particular conduct is illegal. As stated above, the ultimate test is whether a person of ordinary intelligence could read the statute and understand that his conduct was illegal. The most basic problem with the appellants' challenge in the instant case is that they do not contend even that the statute is ambiguous, no less facially invalid for vagueness.[16] In their Reply Brief, the appellants contend that "this Court should determine that the statute is clear in excluding all forms, variations and mediums of bingo conducted by nonprofit organizations from the statute's own definition of gambling."

 [¶ 53] This, of course, is exactly what the district court did. The district court said that bingo is legal, but that Fast Action Bingo is not bingo, and that it is, therefore, illegal. The district court said that bingo conducted by a non-profit organization is legal, but that Fast Action Bingo is not being conducted by a non-profit organization, and that it is, therefore, illegal. We

agree. The statute is not ambiguous and it is not vague as applied to these facts. The word "bingo" used in the statute has a plain and ordinary meaning that was recognized by the district court and that has been detailed hereinabove.[17] The phrase "conducted by charitable or nonprofit organizations"—in its own sense and as held by this Court in *37 Gambling Devices*—does not include the situation where a for-profit entity takes half of the profits. Fast Action Bingo simply is not a "form or variation" of the game of bingo.

[¶ 54] Finally, the appellants contend that they are victims of arbitrary and discriminatory enforcement of the statute. They point to the fact that state prosecutors have not previously attempted to shut down Fast Action Bingo, despite its lengthy history in Wyoming, and to the fact that state prosecutors have not attempted to shut down Prime Time Bingo, a similar game being conducted by KTWO–TV.

 [¶ 55] The appellants present this issue as part of their due process and vagueness argument and, indeed, we have often considered the question of arbitrary and discriminatory prosecution under that rubric. *See, for example, Saiz*, 2001 WY 76, ¶ 9, 30 P.3d at 24; *Lovato*, 901 P.2d at 412; *McCone*, 866 P.2d at 746; and *Griego v. State*, 761 P.2d 973, 976 (Wyo.1988). We have also, however, characterized similar arguments as "selective prosecution," and have analyzed them under the equal protection doctrine, or a combination of the two protections. *See, for example, Moe*, 2005 WY 58, ¶ 9, 110 P.3d at 1210; *Giles*, 2004 WY 101, ¶ 17, 96 P.3d at 1032; and *Misenheimer v. State*, 2001 WY 65, ¶¶ 16–19, 27 P.3d 273, 281–82 (Wyo.2001). Under either analysis, the present claim must fail because there has been no showing of any impermissible motivation on the part of state prosecutors. *Giles*, 2004 WY 101, ¶ 17, 96 P.3d at 1032;

---

16. In response to a specific question during oral argument, the appellants' counsel stated that the statute is unambiguous.

17. A statute is not ambiguous or void for vagueness just because it contains words that are not defined within the statute. Such would be an impossible standard, given that virtually every

statute contains words that are not defined. In determining legislative intent, this Court frequently looks to the common meaning of undefined statutory terms. *See, for example, Giles*, 2004 WY 101, ¶¶ 20–21, 96 P.3d at 1034–35; and *Alcalde v. State*, 2003 WY 99, ¶¶ 15–16, 74 P.3d 1253, 1260–61.

and *Misenheimer*, 2001 WY 65, ¶ 17, 27 P.3d at 281.

A selective prosecution exists when it is demonstrated that others similarly situated have not been prosecuted and the prosecution of the defendant is based on an impermissible motive. *Crozier v. State*, 882 P.2d 1230, 1235 (Wyo.1994). "The impermissible motivation must be demonstrated by showing that the charge was deliberately based on an unjustifiable standard or designed to inhibit the exercise of a constitutional right by the accused." *Id.*

*Misenheimer*, 2001 WY 65, ¶ 17, 27 P.3d at 281. The present record is totally devoid of any evidence explaining the various prosecutor's apparently individual decisions to threaten or pursue prosecution under the gambling statutes. In the absence of such evidence, we are certainly unwilling to presume impermissible motives, especially in light of the holdings of *37 Gambling Devices*. The mere fact that the appellants got away with violating the statutes for quite some time does not equate to arbitrary and discriminatory prosecution in their present situation.

## CONCLUSION

[¶ 56] Nothing even resembling Fast Action Bingo existed in 1971, and Fast Action Bingo could not have been contemplated by the legislature in that year's session. While the meanings of statutory terms are not necessarily frozen in time, neither are they so amorphous as to have no meaning at all.

"The true rule is that statutes are to be construed as they were intended to be understood when they were passed. Statutes are to be read in the light of attendant conditions and the state of the law existent at the time of their enactment. The words of a statute must be taken in the sense in which they were understood at the time when the statute was enacted. If the language used is broad enough to include unknown things which might spring into existence in the future, they would be deemed to come within, and be subject to, the evident meaning of the terms used, but it does not follow, when a newly invented or discovered thing is called by some familiar word, which comes nearest expressing the new idea, that the thing so styled is really the thing formerly meant by the familiar word."

*Farmers Automobile Inter–Insurance Exchange v. MacDonald*, 59 Wyo. 352, 140 P.2d 905, 913 (1943) (*quoting* 25 R.C.L. 959, § 215). For an activity to fit the statutory bingo exclusion, it must be closely similar in nature to the concept of bingo as it existed when the exclusion was adopted. However, even Paul Perez, owner of Dream Games, admitted under cross-examination that his "Fast Action Bingo machine duplicates not session bingo, but Quick Shot Bingo[.]" Fast Action Bingo is not bingo in the sense of the word as it was used in 1971.[18]

[¶ 57] The district court was correct in all of its major conclusions, which are interrelated: (1) Fast Action Bingo is not statutory bingo; (2) Dream Games operates Fast Action Bingo, thereby inducing others to engage in gambling, with the intent to derive a profit therefrom; (3) Fast Action Bingo equipment and machines are gambling devices because they are used in the playing phase of that operation; and (4) the statutes are not unconstitutionally vague as applied to Fast Action Bingo.

[¶ 58] We affirm.

---

**18.** While we see no need to go that far, some courts have held that ***all*** electromechanical versions of authorized games are, by their very nature, so different from the traditional versions of the games that they do not meet statutory gambling exceptions. *Citation Bingo, Ltd.*, 910 P.2d at 284–86.