2001 WY 76

**Ivan Gilbert SAIZ, Appellant (Defendant),**

v.

**The STATE of Wyoming,
Appellee (Plaintiff).**

No. 00–170.

Supreme Court of Wyoming.

Aug. 20, 2001.

Sylvia L. Hackl, State Public Defender; Donna D. Domonkos, Appellate Counsel; and Ryan R. Roden, Assistant Appellate Counsel.

Gay Woodhouse, Attorney General; Paul S. Rehurek, Deputy Attorney General; and D. Michael Pauling, Senior Assistant Attorney General.

Before LEHMAN, C.J., and GOLDEN, HILL, KITE, and VOIGT, JJ.

VOIGT, Justice.

[¶ 1] In December 1999, a jury found appellant, Ivan Saiz, guilty of first-degree sexual assault in violation of Wyo. Stat. Ann. § 6–2–302(a)(iv) (LexisNexis 2001),[1] and the district court sentenced appellant to a seven to fourteen year prison term. Appellant appeals from the Judgment and Sentence of the Court, asserting Wyo. Stat. Ann. § 6–2–302(a)(iv) is unconstitutionally vague, both facially and as applied to his case, and that the evidence at trial was insufficient to convict him of first-degree sexual assault. We affirm.

## ISSUES

[¶ 2] Appellant raises two issues on appeal:
*ISSUE I*

Whether W.S. § 6–2–302(a)(iv) is unconstitutionally vague facially and as applied to the facts in the case, denying appellant due process of law, because it provides no stan-
dard of conduct for which a person of ordinary sensibilities could reasonably understand that which is prohibited and it allows for arbitrary and discriminatory enforcement.

*ISSUE II*

Whether Appellant's conviction for sexual assault cannot stand because insufficient evidence supports it.

The State of Wyoming, as appellee, phrases the issues in substantially the same manner.

## FACTS

[¶ 3] The victim, age nineteen, was born with Down's syndrome and is considered "moderately retarded." On September 30, 1998, the victim and her mother were relaxing at their Cheyenne residence upon returning home from school[2] and work respectively. At some point, the mother's boyfriend and appellant arrived at the residence and all four individuals began watching television. Appellant sat next to the victim on the floor, where they had a brief conversation, while the mother and her boyfriend sat together on the couch.

[¶ 4] The mother, the boyfriend, and appellant later met at a local bar to "shoot" darts,[3] leaving the victim at home with her brother. The victim went to her bedroom, closed the door and put on her pajamas, attempting to sleep while listening to the radio. The three adults eventually returned to the residence with a twelve-pack of beer, at which time the mother verified that the victim was in bed. The mother and her boyfriend retired to their bedroom, providing appellant a blanket and pillow, presumably to sleep on the couch. Appellant obliged because he "pitched in on the beer" and "wanted to drink what [he] pitched in."

[¶ 5] The victim testified that appellant, without invitation, entered her bedroom and initiated a sexual encounter with her. Appel-

---

1. At the close of the State's case-in-chief, the district court dismissed a second count of first-degree sexual assault due to insufficient factual evidence regarding an alleged October 1, 1998, incident between appellant and the victim.

2. The victim participated in a Community Living Access Skills program at Cheyenne East High School emphasizing independence, job, vocation, and cooking skills.

3. All three individuals consumed alcohol at various times during the evening.

lant testified in his own defense and admitted that he entered the victim's bedroom, where he got into her bed, kissed the victim on the mouth, touched her breasts, removed the victim's pants and performed oral sex on her, and touched and digitally penetrated the victim's vagina. Appellant ceased the encounter when the victim stated that she had to "go to school tomorrow." Appellant then left the victim's bedroom, finished his beer, and went to bed in the living room.[4]

[¶ 6] Appellant's version of the events contradicted the victim's testimony in several respects. According to appellant, the victim initiated contact with him by hugging and kissing him and putting her hand on his thigh, claiming also that the victim led appellant to her bedroom, where she responded favorably to his sexual advances. Nevertheless, the jury found appellant guilty of first-degree sexual assault.

## DISCUSSION

### CONSTITUTIONALITY OF WYO. STAT. ANN. § 6–2–302(a)(iv)

[¶ 7] Appellant contends that Wyo. Stat. Ann. § 6–2–302(a)(iv) is unconstitutionally vague, both on its face and as applied to his case. In particular, appellant argues that the statute is facially deficient because it does not precisely define or objectively quantify how an actor can know that another person is mentally impaired or at what level, cognitive or otherwise, a person becomes mentally deficient, which causes one to "guess" whether a victim is capable of understanding the nature of his or her conduct. Appellant reiterates this argument in the context of whether the statute is unconstitutionally vague as applied to his case, adding that the statute is subject to arbitrary and discriminatory application across the broad spectrum of victims' assessed levels of cognitive thinking and understanding.

[¶ 8] Wyo. Stat. Ann. § 6–2–302 provides, in pertinent part:

(a) Any actor who inflicts sexual intrusion on a victim commits a sexual assault in the first degree if:

* * *

(iv) The actor knows or reasonably should know that the victim through a mental illness, mental deficiency or developmental disability is incapable of appraising the nature of the victim's conduct.

Wyo. Stat. Ann. § 6–2–301 (Lexis 1999) defines "actor," "victim," and "sexual intrusion." "Incapable" commonly means "lacking capacity, ability, or qualification for the purpose or end in view * * *." Merriam Webster's Collegiate Dictionary 586–87 (10th ed.1999). In this context, "appraising" commonly means "to evaluate the worth, significance, or status of." *Id.* at 57.

[¶ 9] In challenging a statute for facial vagueness, appellant must demonstrate that the statute reaches a "substantial amount of constitutionally protected conduct,[5] or the statute specifies no standard of conduct at all." *Campbell v. State*, 999 P.2d 649, 657 (Wyo.2000). The ultimate test is "whether a person of ordinary intelligence could read the statute and comprehend what conduct is prohibited" because laws must provide explicit standards for those who apply them. *Id.* " 'A statute employs a standard, for purposes of vagueness, if "by [its] terms or as authoritatively construed [it applies] without question to certain activities, but whose application to other behavior is uncertain," ' " whereas a vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. *Id.* (*quoting Luplow v. State*, 897 P.2d 463, 466 (Wyo.1995) and *Griego v. State*, 761 P.2d 973, 976 (Wyo.1988)).

[¶ 10] Every law is presumed constitutional, with all doubt resolved in its favor. *Campbell*, 999 P.2d at 657 (*quoting Luplow*, 897 P.2d at 466 and *Keser v. State*, 706 P.2d 263, 266 (Wyo.1985)). "In consider-

---

4. According to the mother, appellant was gone the next morning.

5. Appellant does not argue that the statute reaches any form of constitutionally protected conduct.

ing statutory language, the plain, ordinary and usual meaning of the words used controls in the absence of clear statutory provisions to the contrary." *Campbell*, 999 P.2d at 657 (*citing Keser*, 706 P.2d at 266). While penal statutes are strictly construed, "they need not be given unnecessarily narrow meaning in disregard of the obvious legislative purpose and intent." *Campbell*, 999 P.2d at 657. Indeed, " 'lack of precision is not itself offensive to the requirements of due process.' " *Sorenson v. State*, 604 P.2d 1031, 1033 (Wyo.1979) (*quoting Roth v. United States*, 354 U.S. 476, 491, 77 S.Ct. 1304, 1312, 1 L.Ed.2d 1498 (1957)).

[¶ 11] In *Righter v. State*, 752 P.2d 416, 420 (Wyo.1988), we established that the language of Wyo. Stat. Ann. § 6–2–302(a)(iv) "should not be analyzed in a vacuum. Rather, it should be considered in light of the obvious legislative intent of protecting a class of persons who cannot fully comprehend what they are doing." [6] We explicitly addressed whether Wyo. Stat. Ann. § 6–2–302(a)(iv) was unconstitutionally vague, finding that

> [w]hat is clearly proscribed is the infliction of sexual intrusion \* \* \* on a victim who is mentally deficient. In essence, an ordinary intelligent person applying common sense to the statute would not have to guess at its meaning to understand that to avoid punishment under the statute, one must refrain from performing a sex act with a person who the actor knows, or should know, is mentally incapable of understanding the nature and possible consequences of sexual activity. No other meaning would be attributed by persons of ordinary sensibility than that which the statute clearly states. Section 6–2–302(a)(iv) is not unconstitutionally vague.

*Righter*, 752 P.2d at 420. In other words, considering the plain and ordinary meaning of the statutory language in the context of the statute's purpose, we found that the statute incorporates "an adequate standard of conduct so that a person of ordinary intelligence readily could read this statute and comprehend the conduct that is prohibited." *Brock v. State*, 981 P.2d 465, 470 (Wyo.1999).

[¶ 12] The statute certainly is not so deficient as to specify "no standard at all." "[A] person of ordinary intelligence can weigh his contemplated conduct against a prohibition of [inflicting sexual intrusion on a victim who the actor knows or reasonably should know is mentally incapable of understanding the nature and possible consequences of sexual activity] and know whether or not such contemplated conduct is proscribed by it." *Sorenson*, 604 P.2d at 1035. As another court has commented regarding similar statutory language:

> "The language ... sufficiently warns a person of common intelligence that engaging in sexual [intrusion] with one who is mentally handicapped to a degree that he or she cannot understand the nature and consequences of engaging in the act is prohibited. Under normal circumstances a mental incapacity to consent would be apparent in ordinary social intercourse. The fact that further questioning may be necessary in some cases to determine if one's partner fully understands the nature and consequences of sexual intercourse, does not render the statute unconstitutional."

*State v. Smith*, 215 Wis.2d 84, 572 N.W.2d 496, 500 (1997) (*quoting Keim v. State*, 13 Kan.App.2d 604, 777 P.2d 278, 280–81 (1989)). " 'We believe that citizens who desire to obey the statute will have no difficulty in understanding it \* \* \*.' " *Sorenson*, 604 P.2d at 1035 (*quoting Colten v. Kentucky*, 407 U.S. 104, 110, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584 (1972)).

---

**6.** While we do not consider Wyo. Stat. Ann. § 6–2–302(a)(iv) to be nearly as broad as Wyo. Stat. Ann. § 14–3–105 (LexisNexis 2001), the two statutes serve similar purposes. We previously stated in analyzing the language contained in the 1977 version of Wyo. Stat. Ann. § 14–3–105 that " '[d]ue process does not require that this statute, with its beneficent purpose, spell out in exact words what constitutes the conduct made punishable' " and further that " '[a]lthough the language of the statute is broad and the prohibited behavior is very general, this seems *necessary* in the nature of its subject matter.' " *Sorenson*, 604 P.2d at 1035 (*quoting Millhollan v. State*, 221 Ga. 165, 143 S.E.2d 730, 733 (1965); *Anderson v. State*, 562 P.2d 351 (Alaska 1977); and *People v. Beaugez*, 232 Cal.App.2d 650, 43 Cal.Rptr. 28, 33 (1965)) (emphasis in original). *See also Campbell*, 999 P.2d at 657–58 (discussing the need for general statutory language in child protection statutes).

[¶ 13] Appellant also contends that the statute is vague as applied to his case. Accordingly, we must determine whether the statute provides sufficient notice to a person of ordinary intelligence that appellant's conduct was illegal, and whether the facts of the case demonstrate arbitrary and discriminatory enforcement.[7] "When evaluating a statute to determine whether it provides sufficient notice, we must again consider not only the statutory language but also any prior court decisions which have placed a limiting construction on the statute or have applied it to specific conduct." *Griego*, 761 P.2d at 976. If the statute has been previously applied to conduct substantially identical[8] to that of the appellant, he cannot complain notice was lacking. *Id.* We adequately considered the statutory language in the context of appellant's facial challenge.

[¶ 14] The record indicates that appellant recognized his actions were unlawful.[9] Notably, appellant at one point told a police officer that he could not "see himself doing anything to [the victim] because of her Down's syndrome" and on another occasion told the same officer that he previously lied about his version of what occurred because he "didn't want to get into trouble." Appellant also informed the officer that the victim's version of events was accurate and that he felt bad and had not been able to sleep. The following colloquy occurred between the State and appellant during appellant's testimony:

Q. Mr. Saiz, you know that whatever you did back on September 30th was wrong; is that right?

A. Yes.

Q. And you know it's wrong because [the victim] has Down's syndrome?

A. Now I know she has Down's syndrome, yes.

Q. And that was why it was wrong?

A. (Witness nodding head).

Q. You have to answer audibly.

A. Yes.

[¶ 15] In *Righter*, 752 P.2d at 417, the appellant, a stranger, inflicted sexual intrusion on two "mildly retarded" victims after inviting them to his home and providing them alcohol and at least one other substance. The victims had IQ's of 65 and 61 and functioned essentially as nine-year-olds. *Id.* at 421. One victim had previously engaged in sexual activity with a female, and the other victim had a "limited capability" to understand the nature of his conduct. *Id.* at 419, 421. After reviewing an array of evidence regarding the outward manifestation of the victims' mental deficiencies, the victims' mental capabilities, and whether the victims were indeed able to appraise the nature and consequences of their conduct, we concluded that the evidence was sufficient to sustain the appellant's conviction. *Id.* at 421.

[¶ 16] Considering the evidence referenced in the context of appellant's sufficiency of the evidence argument, we find that appellant's conduct was substantially similar to that of the appellant in *Righter*, and Wyo. Stat. Ann. § 6–2–302(a)(iv) is therefore not unconstitutionally vague as applied to appellant.

## SUFFICIENCY OF THE EVIDENCE

[¶ 17] Appellant next argues that the evidence produced at trial was insufficient to sustain his first-degree sexual assault conviction. According to appellant, the State failed to prove beyond a reasonable doubt that appellant knew or reasonably should have known that the victim, through a mental deficiency or developmental disability, was incapable of appraising the nature of her conduct because the victim's outward, objective manifestations (as opposed to "subjective" evidence regarding what appellant

---

7. There is no evidence in this case of arbitrary or discriminatory enforcement.

8. In citing to this standard in *Griego*, we initially used the term "identical," but found that Griego's conduct was "substantially identical" to the appellant's conduct in *Sorenson*. *Griego*, 761 P.2d at 976.

9. *See Campbell*, 999 P.2d at 658–59 (discussing a defendant's knowledge regarding whether her conduct was unlawful in the context of an "as applied" constitutional challenge) and *Sorenson*, 604 P.2d at 1035 (appellant's statement to twelve-year-old victim that "you won't tell anybody, will you?" reflects recognition that his actions constituted immodest, immoral, or indecent liberties as forbidden by the statute).

should have known about the victim's functioning level) reasonably led appellant to believe the victim was capable of consenting to sexual activity.[10] In advancing this argument, however, appellant relies primarily on his own version of what occurred on September 30, 1998, most of which contradicts the victim's testimony.

> When reviewing an appeal based on sufficiency of the evidence, we view the evidence, and any applicable inferences based on the evidence, in a light most favorable to the State. *Nixon v. State*, 994 P.2d 324, 329 (Wyo.1999); and *see Pool v. State*, 2001 WY 8, 17 P.3d 1285 (Wyo.2001). In conducting such a review, we do not substitute our judgment for that of the jury; rather, we determine whether a quorum of reasonable and rational individuals would, or even could, have found the essential elements of the crime were proven beyond a reasonable doubt. *Id.*

*McFarlane v. State*, 2001 WY 10, ¶ 4, 17 P.3d 31, 32 (Wyo.2001).

 [¶ 18] Viewing the record according to this standard, we find that the evidence and its accompanying inferences were sufficient for the jury to find beyond a reasonable doubt that appellant knew, or reasonably should have known, that the victim, through a mental deficiency or developmental disability, was incapable of appraising the nature of her conduct. In *Righter*, 752 P.2d at 421, we evaluated the sufficiency of the evidence as to whether the appellant in that case knew or reasonably should have known that his two "mildly retarded" victims had mental or developmental deficiencies, and whether as a result of those deficiencies, the victims were incapable of appraising the nature of their conduct. In doing so, we pointed to evidence regarding the victims' outward appearances of mental or developmental deficiencies, their ability to interact socially and understand the significance of sexual activity, their ability to make adult rationalizations or decisions about the activity itself and understand the ramifications of adult relationships that include sexual activity, the victims' IQ's and age equivalent functioning levels, and their resulting vulnerability to manipulation. *Id.* The record in the instant case contains evidence quite similar to the evidence we found to be sufficient in *Righter*.

[¶ 19] One clearly can infer that appellant knew of his victim's mental deficiency or developmental disability. While growing up in California, appellant attended special school classes where he interacted with others that had Down's syndrome. Appellant first met the victim prior to September 30th, when he helped the victim's mother move into a new home. At that time, appellant and the victim engaged in a brief conversation, and when asked if he noticed that the victim had a developmental disability, appellant replied that "[s]he was different, yeah." On September 30, 1998, the victim and appellant again briefly conversed when they began watching television. The victim said "hi," told appellant her age, and they discussed what was on television. Appellant also testified that when he and the victim engaged in sexual activity, he "knew" the victim "had something," but claimed not to know precisely what "Down's syndrome" was.

[¶ 20] In addition, Officer Glenda Frank of the Cheyenne Police Department spoke with appellant several times in 1998. Appellant first denied committing the instant offense, stating that the victim had "come onto him" and that "he was aware that she had Down's syndrome and that he felt sorry for her." According to Officer Frank, appellant later recalled that he could have done something to the victim but that he did not remember because he had been drinking, stating that he "couldn't see himself doing anything to her because of her Down's syndrome." Appellant ultimately told Officer Frank that he had initially lied about his version of what occurred, that the victim's version of events was accurate, and that he felt bad and had not been able to sleep.

[¶ 21] Knowledge is frequently proved by circumstantial evidence. According to the victim's pediatrician, individuals with Down's syndrome typically exhibit certain outward

---

10. Appellant does not challenge the sufficiency of the evidence as to any other element of the crime charged.

attributes such as a unique, slanted eye appearance, short stature, weakness in strength, and mental retardation (an average IQ range of 45—55). The record indicates that the victim was four feet, eight inches tall (the average height for individuals with Down's syndrome being four feet, six inches) and had worked with a speech therapist in the past. Appellant's counsel even noted, in referring to the victim as he questioned the victim's pediatrician, that "we saw her in the courtroom, she's of a diminutive size, she looks younger than she is." The victim appears to have answered counsel's questions in short, choppy and often incomplete sentences throughout her testimony. Perhaps most importantly, the jury observed the victim testify and was able to assess factors such as her physical appearance, stature, demeanor, and the manner and qualitative level of the victim's speech.

[¶ 22] Several witnesses also testified regarding the victim's IQ and age-equivalent functioning level. The victim's mother testified that the victim, whose favorite toys are empty shampoo bottles, functions as a seven or eight year old. According to the victim's special education teacher, the victim had an IQ of 52 with kindergarten to lower first grade math and reading comprehension levels. The victim's pediatrician testified that the victim was "moderately retarded," with an IQ of 50, and functioned at the eight-year-old or second grade level. A clinical psychologist also considered the victim to be "moderately retarded," with a full-scale IQ of 57, placing the victim in the first percentile for her age.[11] According to the clinical psychologist, the victim took a comprehensive subtest to measure her practical knowledge and knowledge regarding social conventions, scoring a 2 out of a 2 through 19 scoring range. This score placed the victim in the fourth percentile for her age.

[¶ 23] These same witnesses offered their opinions regarding the resulting significance of the victim's IQ and age-equivalent functioning level. The special education teacher testified that the victim would never be able to live independently and personally observed that others are able to "very easily" manipulate the victim, especially if the victim feels that compliance would translate into acceptance by the other person.

[¶ 24] According to the victim's pediatrician, Down's syndrome significantly impairs an individual's intellectual and emotional base, which reduces the ability to exercise judgment. Therefore, the victim's pediatrician indicated that supervision is necessary to assist in exercising judgment "and making the right decision so that they are safe and not vulnerable to exploitation * * *." The victim's pediatrician further observed that the victim was very limited in her ability to exercise judgment, and agreed that there would be situations outside the medical office setting in which the victim would be unable to appraise the nature of her conduct. The clinical psychologist opined that the victim requires supervision commensurate with that of "quite a young child," and would have difficulty understanding social convention and interacting with peers.

[¶ 25] The witnesses' opinions are relevant to whether the victim was ultimately capable of appraising the nature and possible consequences of sexual activity. The victim's pediatrician testified that sexual activity involves not only an understanding of physical actions, but implicates an equally important psycho-emotional impact, as well as other consequences including pregnancy and sexually transmitted diseases. In *Righter*, 752 P.2d at 421, we pointed to similar IQ/functioning level evidence and considered other evidence regarding whether the victims in that case, despite understanding the difference between "having sexual intercourse with a woman as opposed to a man, and to some degree the social stigma often associated with homosexual relations," were capable of making adult rationalizations or decisions about the activity itself, understanding the ramifications of adult relationships that include sexual activity, and whether the victims were vulnerable to fear and manipulation.

[¶ 26] The significance of the victim's IQ and age-equivalent functioning level notwithstanding, when asked by appellant's counsel

---

11. In other words, in a random sample of 100 individuals of the same age, it is predicted that 99 of the 100 individuals would have higher IQ scores than the victim.

if she knew what sex was, the victim replied "no" and testified that she had not kissed another male or had a boyfriend before. The victim's mother testified that she had never discussed sex with the victim prior to September 30, 1998, was not sure the victim "comprehends exactly what sex is," and that if the victim has sexual urges, she does not believe the victim understands them.[12]

## CONCLUSION

[¶ 27] We find that Wyo. Stat. Ann. § 6–2–302(a)(iv) is not unconstitutionally vague on its face, or as applied to appellant, and that the evidence produced at trial was sufficient to support the jury's guilty verdict. Accordingly, appellant's first-degree sexual assault conviction and sentence are affirmed in all respects.

---

12. The victim's special education teacher testified that the victim participated in a sexual education class dealing with "good touch/bad touch, touch with a stranger, family touch, friend touch, that kinda thing." Based on this information, the teacher believed that the victim likely knew the physical actions involved in sexual activity and that sexual intercourse could possibly lead to pregnancy. However, this does not necessarily encompass all of the considerations relevant to whether the victim was capable of appraising the nature and consequences of sexual activity. In *Righter*, 752 P.2d at 421, we found the evidence to be sufficient despite one victim having previously engaged in sexual activity with a female (as opposed to a male) and the other victim having possessed a "limited capability" of appraising the nature of his conduct. The record in the instant case does not come close to approaching that level. The jury, having considered the totality of the evidence regarding this issue, found the evidence to be sufficient beyond a reasonable doubt. Viewing the entire record and its reasonable inferences in a light most favorable to the State, as we must, we concur with the jury's assessment.