# IN THE SUPREME COURT, STATE OF WYOMING

## 2019 WY 102

OCTOBER TERM, A.D. 2019

*October 9, 2019*

RAYMOND MARTIN BROWN,

**Appellant
(Defendant),**

v.

S-19-0021

THE STATE OF WYOMING,

**Appellee
(Plaintiff).**

*Appeal from the District Court of Natrona County
The Honorable W. Thomas Sullins, Judge*

*Representing Appellant:*

> Diane Lozano, State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; Robin S. Cooper, Senior Assistant Appellate Counsel. Argument by Ms. Cooper.

*Representing Appellee:*

> Bridget L. Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Christyne M. Martens, Senior Assistant Attorney General; Timothy P. Zintak, Assistant Attorney General. Argument by Mr. Zintak.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BOOMGAARDEN, Justice**.

[¶1]    A jury convicted Raymond Martin Brown of sexual assault in the third degree and intentional abuse of a vulnerable adult.  The district court sentenced him to a total of four to twelve years in prison.  On appeal, Mr. Brown argues the district court committed plain error by admitting hearsay evidence, and that the evidence was insufficient to support the jury verdict.  We affirm.

## *ISSUES*

[¶2]    Mr. Brown raises two issues, rephrased as:

> I.     Whether the district court committed plain error when it admitted hearsay testimony from several witnesses and a video recording of SA's interview with the Children's Advocacy Project.

> II.    Whether the evidence was sufficient for the jury to convict Mr. Brown of sexual assault in the third degree and intentional abuse of a vulnerable adult.

## *FACTS*

[¶3]    In early July 2017, the Kelly Walsh High School Class of 2007 gathered in Casper to celebrate its ten-year reunion with various activities, including a party at the Keg & Cork, a local bar.  SA went to the Keg & Cork with her cousin, Lauren Lein, and her cousin's husband, Nicholas Lein.

[¶4]    Mr. Brown, a fellow member of the Class of 2007, also went to the Keg & Cork that night.  At the bar, Mr. Brown met SA for the first time, began kissing her, and took her hand to lead her to his truck.  In the truck, Mr. Brown continued kissing SA, and then began touching her breasts and vaginal area.  He then grabbed SA's hand, and placed it on his genitals.  SA twice told Mr. Brown to stop.  After SA told Mr. Brown to stop the second time, Mr. Brown stated he had to use the restroom and stepped out of the truck to do so.

[¶5]    As soon as Mr. Brown left the truck, SA returned to the bar and told her cousin someone had just done "sex stuff" with her.  After hearing this, Mrs. Lein got her husband's attention, and told him what SA had just told her.  SA then showed them the truck and described the clothes of the individual who took her to the truck.  SA then identified that individual as Mr. Brown.  Mrs. Lein confronted Mr. Brown, ordered him to leave the bar, hit him, and then called 9-1-1.  Police officers arrived and Officers Craig Burns and Alyssa Baedke spoke with SA about what had happened.  The following Monday, Rosemary

1

Bartle, a forensic interviewer and a licensed professional counselor with the Children's Advocacy Project (CAP), interviewed SA.

[¶6]    On November 30, the State charged Mr. Brown with two felonies: sexual assault in the third degree, in violation of Wyo. Stat. Ann. § 6-2-304(a)(iii),[1] and abuse of a vulnerable adult, in violation of Wyo. Stat. Ann. § 6-2-507(a).[2]  Over the course of a four-day trial, the State presented evidence that falls into two general categories: evidence regarding SA's disability, and evidence concerning the sexual contact.

[¶7]    With respect to the second alternative circumstance of sexual assault in the third degree and to intentional abuse of a vulnerable adult, the jury had to find SA had a disability.  *See* Wyo. Stat. Ann. §§ 6-2-304(a)(iii), 6-2-302(a)(iv) (LexisNexis 2019) (sexual assault in the third degree requires a showing that the defendant knew or reasonably should have known that the victim "through a *mental illness, mental deficiency or developmental disability* is incapable of appraising the nature of the victim's conduct.") (emphasis added); *see also* Wyo. Stat. Ann. §§ 6-2-507, 35-20-102(a)(xviii) (LexisNexis 2019) (defining a "vulnerable adult" as someone "eighteen (18) years of age or older who is unable to manage and take care of [herself or her] money, assets or property without assistance as a result of . . . *mental disability*[.]") (emphasis added).  To support this finding, the State presented evidence from Dr. Kenneth Bell that SA, a thirty-one-year-old woman with Down syndrome, cannot live and spend money on her own without "the assistance of a guardian and a payee."  To compensate for this inability, SA's mother holds both legal conservatorship and guardianship over SA and her money.  SA's mother testified that although SA continuously makes noteworthy achievements—such as holding a job, having a "fiancé" who is a young man with Down syndrome, and going out to bars with her friends—those accomplishments are possible only if facilitated by a family member.  SA's IQ-to-age equivalency placed her reasoning at the level of an individual seven years and eight months old.

[¶8]    In addition to SA's disability, the jury had to find that Mr. Brown engaged in sexual contact with SA.  *See* Wyo. Stat. Ann. §§ 6-2-304(a)(iii), 6-2-302(a)(i) (sexual assault in

---

[1] Sexual assault in the third degree occurs when a person "subjects a victim to sexual contact under any of the circumstances of W.S. 6-2-302(a)(i) through (iv)."  Wyo. Stat. Ann. § 6-2-304(a)(iii).  The State charged Mr. Brown with one count of sexual assault in the third degree, but offered two of those circumstances as alternatives by which the jury could convict: first, the State alleged that Mr. Brown "(i) . . . cause[d] submission of the victim through the actual application, reasonably calculated to cause submission of the victim, of physical force or forcible confinement"; and, second, it alleged that Mr. Brown "(iv) . . . kn[ew] or reasonably should [have] know[n] that the victim through a mental illness, mental deficiency or developmental disability is incapable of appraising the nature of the victim's conduct."  Wyo. Stat. Ann. § 6-2-302(a)(i), (iv).  At trial, the court instructed the jury that it could convict him under either or both circumstances.

[2] In its Second Amended Complaint, the State narrowed the allegation that Mr. Brown abused a vulnerable adult to specify that Mr. Brown *intentionally*, rather than *intentionally or recklessly*, abused a vulnerable adult.  Wyo. Stat. Ann. § 6-2-507.

the third degree occurs when an actor "subjects a victim to *sexual contact* under" either circumstance offered by the State) (emphasis added); *see also* Wyo. Stat. Ann. §§ 6-2-507(a), 35-20-102(a)(ii)(E), (xxii) (defining "abuse" in the abuse of a vulnerable adult statute to include "sexual abuse," and defining "sexual abuse" to include "*sexual contact*") (emphasis added). To support the sexual contact finding, the State called SA to testify about what happened at the bar and in Mr. Brown's truck. Additionally, the State called SA's cousin, SA's cousin's husband, Officers Burns and Baedke, and Ms. Bartle to testify, among other things, about SA's statements to them about what happened the night of the assault. The State also played for the jury the video recording of Ms. Bartle's CAP interview with SA. Finally, the State called a forensic scientist from the biological and DNA unit of the Wyoming State Crime Lab to testify about DNA that officers recovered from the truck, SA, and Mr. Brown.

[¶9]   At trial, Mr. Brown primarily argued that he was either not the person who assaulted SA, or, if he was, he was too intoxicated to form the requisite intent. With respect to his intoxication, the State presented evidence that Mr. Brown had a retrograde blood alcohol level anywhere between 0.14 and 0.23 at the time of the assault (depending on Mr. Brown's regular level of alcohol intake). However, two witnesses testified that, despite his intoxication, Mr. Brown appeared coherent during that time.

[¶10] The jury convicted him of sexual assault in the third degree, under both circumstances referenced above, and intentional abuse of a vulnerable adult. The district court sentenced Mr. Brown to concurrent sentences of four to twelve years for sexual assault in the third degree and four to eight years for intentional abuse of a vulnerable adult. This timely appeal followed.

[¶11] Additional facts are set forth below as necessary.

## *DISCUSSION*

**I.     *The district court did not plainly err when it admitted alleged hearsay testimony and a video recording of SA's interview with the Children's Advocacy Project.***

[¶12] Mr. Brown argues the district court erred when it admitted hearsay testimony from five witnesses—Mrs. Lein, Mr. Lein, Officer Baedke, Officer Burns, and Ms. Bartle—and the CAP interview video. We conclude that Mr. Brown fails to establish plain error with respect to the alleged hearsay because he cannot establish the district court transgressed a clear and unequivocal rule of law and because Mr. Brown suffered no material prejudice from the admission of the hearsay evidence.

[¶13] We review for plain error because Mr. Brown did not object to the challenged testimony or admission of the CAP video at trial. *See Schreibvogel v. State*, 2010 WY 45, ¶ 26, 228 P.3d 874, 884 (Wyo. 2010). "Plain error exists when: 1) the record is clear about

3

the incident alleged as error; 2) there was a transgression of a clear and unequivocal rule of law; and 3) the party claiming the error was denied a substantial right resulting in material prejudice." *Id.* ¶ 19, 228 P.3d at 882 (citing *Causey v. State*, 2009 WY 111, ¶ 18, 215 P.3d 287, 293 (Wyo. 2009)). With respect to the second requirement, Mr. Brown "must demonstrate the existence of a clear and unequivocal rule of law which the particular facts transgress in a clear and obvious, not merely arguable, way." *Id.* ¶ 30, 228 P.3d at 885 (quoting *Causey*, ¶ 19, 215 P.3d at 293).

### A. The record clearly preserves each alleged error.

[¶14] The record clearly preserves each alleged error, thus satisfying the first plain error requirement. Mrs. Lein testified about what SA told her at the bar after the assault. Mrs. Lein testified that SA came to her and said that "[a] man just took me to his truck in the parking lot . . . and did sex stuff." When she asked what SA meant by "sex stuff," SA said that "[h]e put his tongue in my mouth and tried going up my shirt."

[¶15] Mrs. Lein then asked SA to show her where the "sex stuff" happened and the man. SA showed her the truck—identified at trial as Mr. Brown's truck—and then Mrs. Lein asked if SA could identify the man who did the "sex stuff." Mrs. Lein testified that SA said the man "was wearing a black shirt," and, after looking around the bar, SA pointed at Mr. Brown. Finally, Mrs. Lein confirmed for the jury that Mr. Brown was the same person SA identified that night in the Keg & Cork.

[¶16] Next, Mr. Lein testified about what happened as he was getting ready to leave the bar. After Mrs. Lein got his attention, he "walked up to her, and she [told him] that some guy had tried to take [SA] out to the vehicle and do sex stuff with her."

[¶17] Officer Burns testified about his interview with SA on the night of the assault. He testified that SA told him "she was at the bar and a male approached her, the male started kissing on her, and the male eventually led her outside to his truck." Officer Burns further testified that SA stated that, while in the truck, "he tried to pull her pants down, . . . kept touching her breasts, . . . grabbed her hand and basically had her hand touch the male's penis that he had exposed by pulling his pants down." Finally, Officer Burns testified that SA told him the man "was touching her vaginal area."

[¶18] After Officer Burns decided SA would be more comfortable if a female officer interviewed her, Officer Baedke interviewed SA and testified regarding that interview. SA told Officer Baedke that while in the Keg & Cork, a man started kissing her and then took "her hand and pulled her out of the Keg & Cork" to his vehicle. Officer Baedke testified that SA told her she got in the vehicle on the passenger side, Mr. Brown got in the vehicle on the driver's side, and then he "touched her and did sexy stuff" with her. She further testified that SA "had also stated that she had, once again, you know, said, Can we stop?" SA told Officer Baedke that "he had stopped, and then [SA] continued on and said the male

4

had proceeded to pull her pants halfway down" and touch her vaginal area. Lastly, Officer Baedke testified that SA said the man took her hand and placed it on his genitals.

[¶19] Finally, Ms. Bartle testified about what SA told her during the CAP interview. Ms. Bartle testified that SA told her a man at the bar started kissing her and then took her to his truck where "he began groping her and put his hands also on her genital—his genitals." Ms. Bartle stated that SA "was in the position of feeling like she needed to be feeling him as well. It was not consensual for her, she did not want it to happen and did not agree to the experience." During Ms. Bartle's testimony, the State played the video of this interview.

### B. The court's admission of the challenged evidence did not violate a clear and unequivocal evidentiary rule in a clear and obvious way.

[¶20] Mr. Brown argues admission of the testimony and CAP interview video violated the hearsay rule. W.R.E. 801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." W.R.E. 801(c). Under W.R.E. 802, "[h]earsay is not admissible" unless otherwise provided by the Wyoming Rules of Evidence, this Court, or by statute. W.R.E. 802. Various exceptions and exclusions to the hearsay rule permit a court to admit otherwise inadmissible testimony. *See, e.g.*, W.R.E. 801(d) (exclusions) and 803(1)–(24) (exceptions). However, because defense counsel did not object to admission of any of the evidence Mr. Brown now challenges, the district court did not consider those exceptions or exclusions, and this case presents the same problem on appeal that we identified in *Schreibvogel*. *See Schreibvogel*, ¶¶ 25–30, 228 P.3d at 884–85.

[¶21] A jury convicted Mr. Schreibvogel of two counts of first degree sexual assault and one count of robbery. *Id.* ¶ 1, 228 P.3d at 878. On appeal, he argued the trial court erred when it allowed the State to introduce "inadmissible hearsay" testimony from three witnesses: the investigating officer, an x-ray technician, and an emergency room nurse. *Id.* ¶¶ 25, 27, 228 P.3d at 884. Each of the three witnesses recounted statements the victim made to them, individually. *Id.* ¶ 27, 228 P.3d at 884. Because defense counsel did not object at trial, we acknowledged that it was "difficult to identify the specific basis for admissibility of the challenged testimony." *Id.* ¶ 28, 228 P.3d at 884. Mr. Schreibvogel pointed to the general ban on hearsay as the clear and unequivocal rule of law, but given his counsel's failure to object, and "because the challenged evidence was potentially admissible under several evidentiary rules," Mr. Schreibvogel failed to establish a violation of a clear and unequivocal rule of law in a clear and obvious, not merely arguable, way. *Id.* ¶ 30, 228 P.3d at 885.

[¶22] Because Mr. Brown's counsel similarly did not object at trial, it is exceedingly difficult to identify how the court violated the hearsay rule when it admitted the challenged testimony and CAP interview video. *See id.* The State identifies various means through

which the court could have admitted both the challenged testimony and the CAP interview video. For example, the State asserts that various portions of the challenged evidence could have been admitted as non-hearsay or under exceptions to the hearsay rule, including: (1) to prove the effect on the hearer, (2) as excited utterances under W.R.E. 803(2), or (3) as prior statements of identification under W.R.E. 801(d)(1)(C) because SA testified.[3] Had the district court admitted the challenged evidence over defense counsel's objection under any of these circumstances, defense counsel could have requested, and the court may have provided, appropriate limiting instructions. *Schreibvogel*, ¶ 28, 228 P.3d at 884. As the record stands, however, Mr. Brown's claim that the court violated a clear and unequivocal evidentiary rule in a clear and obvious, not merely arguable, way, falls short because defense counsel never objected to the challenged—but potentially admissible—evidence. *See id.* ¶ 30, 228 P.3d at 885; *Causey*, ¶ 19, 215 P.3d at 293. Neither admission of the challenged testimony nor the CAP interview video violated a clear and unequivocal rule of law in a clear and obvious, not merely arguable, way. *Schreibvogel*, ¶ 30, 228 P.3d at 885.

### C. Mr. Brown also does not establish material prejudice.

[¶23] In any event, Mr. Brown has failed to meet his burden of proving that he was materially prejudiced by admission of the challenged testimony or the CAP interview video. *Snow v. State*, 2009 WY 117, ¶ 34, 216 P.3d 505, 516–17 (Wyo. 2009). He makes a cursory argument with respect to material prejudice, asserting the challenged testimony— without mention of the CAP interview video—was highly prejudicial due to its repetitious nature. Repetition itself does not establish material prejudice, however, and we conclude that the admission of alleged hearsay was not harmful because the record makes clear that any such evidence was "merely cumulative" of other evidence showing Mr. Brown's guilt, including SA's personal account of the assault.[4] *See Griggs v. State*, 2016 WY 16, ¶ 124, 367 P.3d 1108, 1142 (Wyo. 2016) (noting that "an error in admission of hearsay is not

---

[3] Mr. Brown asserts that the challenged evidence could not have been admitted as "prior consistent statements" under W.R.E. 801(d)(1)(B) because defense counsel never alleged that SA's story was recently fabricated or that her testimony was impacted by improper influence or motive. During his cross-examination of SA, however, defense counsel questioned why SA's family members were present when she made her statements to the police, suggesting perhaps that her statements were influenced by family members or that she could not remember the details of the assault without her family members' assistance. Had defense counsel objected to the hearsay evidence, the district court could have determined whether W.R.E. 801(d)(1)(B) applied or not. *See Jones v. State*, 2019 WY 45, 439 P.3d 753 (Wyo. 2019). On this record, however, the most we can conclude is that the court arguably, not clearly, transgressed W.R.E. 801(d)(1)(B). This is not enough to establish plain error.

[4] In various places throughout his brief Mr. Brown asserts, without any substantive analysis, that the witnesses' testimony "ran afoul" of W.R.E. 403. Because he provides no cogent argument or citation to relevant authority on this point, we will not consider whether W.R.E. 403 presents independent grounds for reversal. *See Bear Peak Res., LLC v. Peak Powder Res., LLC*, 2017 WY 124, ¶ 50, 403 P.3d 1033, 1049 (Wyo. 2017) (citation omitted) ("We refuse to consider arguments that are not supported by cogent argument and citation to the record or legal authority.").

6

harmful if the evidence was 'merely cumulative' of other evidence showing the defendant's guilt.").

[¶24] Notwithstanding Mr. Brown's argument to the contrary, this case is distinguishable from *Wilde v. State*, 2003 WY 93, 74 P.3d 699 (Wyo. 2003). In *Wilde*, the victim told her mother, two months after the alleged incident occurred, that Mr. Wilde sexually assaulted her. *Id.* ¶ 6, 74 P.3d at 702. At trial, the court erroneously admitted hearsay testimony consisting of the victim's nearly identical statements about the alleged sexual assault "to her mother, sister, police officer, physician, nurse, and 'forensic interviewer.'" *Id.* ¶ 12, 74 P.3d at 707. We found admission of the testimony prejudicial primarily because the State used the evidence to bolster the victim's testimony by "piling on" the repeated, consistent statements. *Id.* ¶ 14, 74 P.3d at 707–08; *see also Griggs*, ¶ 109, 367 P.3d at 1139.

[¶25] Here, the alleged hearsay did not consist of SA's nearly identical statements about the alleged sexual assault to numerous witnesses months after the alleged incident. Instead, the alleged hearsay evidence consisted of SA's statements immediately after the alleged sexual assault and "in a manner that would be expected in the early stages of a typical investigation." *See Griggs*, ¶ 112, 367 P.3d at 1139. The record also illustrates that defense counsel used the alleged hearsay evidence to highlight inconsistencies between SA's testimony at trial and the facts she shared with, and were testified to, by the other witnesses, and as reflected in the CAP interview video. Defense counsel was thus able to attack SA's credibility using the challenged evidence, something Mr. Wilde's counsel could not do because the testimony consisted of "more-or-less contemporaneous repetitions of a single statement." *Wilde*, ¶ 12, 74 P.3d at 707. Under these circumstances, and on this record viewed as a whole, we see no reasonable probability that the verdict would have been more favorable to Mr. Brown if the alleged evidentiary errors had not been committed. *Griggs*, ¶ 123, 367 P.3d at 1142 (citing *McGinn v. State*, 2015 WY 140, ¶ 13, 361 P.3d 295, 299 (Wyo. 2015)).

## II.     *The evidence was sufficient for the jury to convict Mr. Brown of sexual assault in the third degree and intentional abuse of a vulnerable adult.*

[¶26] Mr. Brown argues the evidence was insufficient for the jury to convict him of sexual assault in the third degree and intentional abuse of a vulnerable adult. With regard to sexual assault in the third degree, he alleges there was insufficient evidence to show that he applied physical force and he knew or should have known of SA's mental disability. With respect to intentional abuse of a vulnerable adult, Mr. Brown alleges that the evidence was insufficient to show that he could form the requisite intent to abuse a vulnerable adult while intoxicated. We conclude there was sufficient evidence with respect to each charge.

[¶27] When reviewing a conviction for sufficiency of the evidence, this Court does not consider "whether or not the evidence was sufficient to establish guilt beyond a reasonable

doubt, but [instead] whether or not the evidence could reasonably support such a finding by the factfinder." *Hill v. State*, 2016 WY 27, ¶ 13, 371 P.3d 553, 558 (Wyo. 2016) (quoting *Levengood v. State*, 2014 WY 138, ¶ 12, 336 P.3d 1201, 1203 (Wyo. 2014)). "We will not reweigh the evidence nor will we re-examine the credibility of the witnesses." *Id.* ¶ 12, 371 P.3d at 558 (citation omitted). We review the sufficiency of the evidence "from this perspective because we defer to the jury as the fact-finder and assume they believed only the evidence adverse to the defendant since they found the defendant guilty beyond a reasonable doubt." *Oldman v. State*, 2015 WY 121, ¶ 5, 359 P.3d 964, 966 (Wyo. 2015) (citation omitted). Consequently, we examine the evidence "in the light most favorable to the State[.]" *Faubion v. State*, 2010 WY 79, ¶ 12, 233 P.3d 926, 929 (Wyo. 2010) (citation omitted). "We accept all evidence favorable to the State as true and give the State's evidence every favorable inference which can reasonably and fairly be drawn from it. We also disregard any evidence favorable to the appellant that conflicts with the State's evidence." *Harnden v. State*, 2016 WY 92, ¶ 5, 378 P.3d 611, 612–13 (Wyo. 2016) (citation omitted).

### A. Sexual assault in the third degree.

[¶28] Mr. Brown only challenges the sufficiency of the evidence to support the State's alternative circumstances regarding how he committed sexual assault in the third degree.[5] As to these two circumstances, the court instructed the jury that the State had to prove beyond a reasonable doubt that:

> 5. [Mr. Brown] caused the submission of [SA] through the actual application, reasonably calculated to cause the submission of [SA], of physical force; or
>
> [Mr. Brown] knew or reasonably should have known that [SA] through a mental illness, mental deficiency or developmental disability was incapable of appraising the nature of [SA's] conduct.

[¶29] The State presented the following evidence in support of the first circumstance: (1) Mr. Brown continued sexually contacting SA after the first time she said "no," and stopped the contact only after she said "no" a second time; and (2) Mr. Brown grabbed SA's hand and placed it on his genitals while he and SA were in his truck. A reasonable jury could have concluded that Mr. Brown's continued contact after SA said "no" and his grabbing SA's hand and placing it on his genitals constituted physical force reasonably calculated to cause submission.

---

[5] Mr. Brown does not challenge the sufficiency of the evidence with respect to any of the remaining elements of sexual assault in the third degree, which identified the date, location, defendant, and that the defendant "subjected the victim, [SA], to sexual contact[.]"

8

[¶30] The State relied on circumstantial evidence to support a finding on the second circumstance. Mr. Brown specifically takes issue with Dr. Bell's testimony regarding the outward characteristics that indicate someone has an intellectual disability. We resolved a similar sufficiency of the evidence challenge to an appellant's conviction for sexual assault in the first degree in *Saiz v. State*, 2001 WY 76, 30 P.3d 21 (Wyo. 2001). Although we considered Mr. Saiz's previous experience and interaction with other individuals with Down syndrome, the length of time he interacted with the victim, and his acknowledgement of the victim's disability—facts not present here—we pointed out that a defendant's "knowledge" is often proved by circumstantial evidence such as the victim's physical characteristics and mannerisms outwardly indicating her disability. *Saiz*, ¶¶ 19–21, 30 P.3d at 27–28. We noted that such circumstantial evidence included:

- The victim's height, IQ range, and physical characteristics indicating mental disability;

- The manner in which the victim answered counsel's questions at trial (i.e., "in short, choppy and often incomplete sentences throughout her testimony");

- Other witnesses' testimony "regarding the victim's IQ and age-equivalent functioning level"; and

- Other witnesses' testimony explaining the relative importance of the victim's IQ and age-equivalent functioning level.

*Id.* ¶¶ 21–25, 30 P.3d at 27–28. Finally, and "[p]erhaps most importantly," we took into consideration that "the jury observed the victim testify and was able to assess factors such as her physical appearance, stature, demeanor, and the manner and qualitative level of the victim's speech." *Id.* ¶ 21, 30 P.3d at 28.

[¶31] *Saiz*'s consideration of circumstantial evidence is instructive here. First, as in *Saiz*, the jury heard evidence about SA's ability to interact socially, to understand sexual activity, to rationalize as an adult, and her IQ and age equivalence. Her full-scale IQ was below the 0.1 percentile,[6] with a composite score of 49, which was consistent with her history of testing. Her verbal comprehension score was in the 0.5 percentile, with a composite score of 61, which was "extremely low." Her IQ-to-age equivalency placed her reasoning at the level of an individual seven years and eight months old. Because of her Down syndrome, SA did not have "the ability to understand complex social interactions including sexual

---

[6] Dr. Bell explained that "[a] percentile means the percent of the population that was used in the development of that test who obtained similar scores to the patient that you're testing." He confirmed that if, for example, "your percentile is one percent, that means 99 percent score higher than you[.]"

behavior." SA's mother basically agreed, stating that while SA understood what sex is, she has an "immature" understanding of human anatomy. While SA loosely knew about having a family, she did not "make th[e] correlation" between sex and babies. Finally, after both SA's mother and Dr. Bell testified, SA testified, allowing the jury to perceive for itself each of these factors. *See id.* ¶ 21, 30 P.3d at 28.

[¶32] Second, as in *Saiz*, several witnesses testified that SA's physical characteristics and speech made her disability apparent. *See id.* ¶ 21, 30 P.3d at 27–28. Dr. Bell testified that SA's dysmorphic features were "obvious," and that most people would know she had a disability after a brief conversation with her. Officer Baedke testified it was "pretty apparent" to her that SA had a disability and Officer Sam Dunnuck testified that it was apparent to him that SA had a disability. Thomas Hallock, a previous Keg & Cork employee, testified that SA's physical characteristics show she has Down syndrome. Once again, SA testified, thus allowing the jury to observe her physical characteristics and speech first hand. *See id.*

[¶33] The jury could reasonably infer from this evidence that Mr. Brown knew or reasonably should have known that SA through a mental illness, mental deficiency or developmental disability was incapable of appraising the nature of her conduct. *See id.* ¶ 18, 30 P.3d at 27.

### B. Intentional abuse of a vulnerable adult.

[¶34] Mr. Brown summarily argues that the evidence was insufficient to show how, while intoxicated, he could form the requisite intent to abuse a vulnerable adult, or how he could ascertain the severity of SA's disability.[7] The court instructed the jury, in relevant part, that to convict Mr. Brown on this charge, the State had to prove beyond a reasonable doubt that Mr. Brown "[i]ntentionally" abused a vulnerable adult. The court instructed the jury on the definition of "intentionally." The court further instructed the jury that self-induced intoxication was a defense to both sexual assault in the third degree and intentional abuse of a vulnerable adult, and on how that defense applied to each crime.

[¶35] While self-induced intoxication is a defense to specific intent crimes, Wyo. Stat. Ann. § 6-1-202 (LexisNexis 2019), evidence of Mr. Brown's intoxication did not preclude the jury from finding he formed the requisite intent. *See Westwood v. State*, 693 P.2d 763, 768–69 (Wyo. 1985). In *Westwood*, the defendant unsuccessfully argued self-induced

---

[7] Mr. Brown argues that the term "individual," as used in the definition of "abuse" in Wyo. Stat. Ann. § 35-20-102(a)(ii), describes a class of persons with more significant relationships with the vulnerable adult than Mr. Brown had with SA. However, Mr. Brown asserts no ambiguity in the statute and he clearly falls within the plain and ordinary meaning of the phrase "other individual." *See Anderson v. State*, 2018 WY 6, ¶ 12, 408 P.3d 1148, 1151 (Wyo. 2018) (quoting *Sikora v. City of Rawlins*, 2017 WY 55, ¶ 23, 394 P.3d 472, 479 (Wyo. 2017)) (stating that "[w]hen a statute is sufficiently clear and unambiguous, we give effect to the plain and ordinary meaning of the words and do not resort to the rules of statutory construction.").

intoxication among other defenses, after stabbing a woman with scissors and stealing her car. *Id.* The jury convicted Mr. Westwood of one count of aggravated assault and battery and another count of unauthorized use of a vehicle. *Id.* at 764–65. On appeal, Mr. Westwood claimed the evidence was insufficient to support his conviction for unauthorized use of a vehicle because his intoxication rendered him "[in]capable of forming the specific intent required for the offense." *Id.* at 768. We looked beyond the evidence of his intoxication to also consider evidence as to the coherency of his speech, his ability to walk and move without any problems, his ability to react to events which occurred while he traveled with the victims, and observations by a police officer. *Id.* at 768–69. Based on that review, we found sufficient evidence to uphold his conviction notwithstanding the evidence of self-induced intoxication. *Id.* at 769.

[¶36] Similar, and ample, testimony supported Mr. Brown's conviction for intentional abuse of a vulnerable adult, despite his intoxication. Viewing the evidence in the light most favorable to the State, Mr. Brown had a blood alcohol level of 0.14 at the time of the assault. Officer Burns testified that when he talked to Mr. Brown at the Keg & Cork that night, Mr. Brown, though intoxicated, appeared coherent and oriented to time and place— "walking and talking, having a conversation." Mrs. Lein testified that when she spoke with Mr. Brown, he spoke fine and stood upright. This evidence, together with the outward manifestations of SA's Down syndrome, supports an inference from which the jury could reasonably conclude that even at his level of intoxication, Mr. Brown was capable of forming the intent to abuse a vulnerable adult.

[¶37] Mr. Brown also argues that "there was no evidence as to how," given his level of intoxication, he "would have been able to grasp the severity of [SA's] disability" during their brief encounter. We reject this argument for the same reasons, and based on the same evidence, set forth in ¶¶ 31, 32, and 36.[8]

## CONCLUSION

[¶38] Mr. Brown has not established that the district court committed plain error by admitting hearsay testimony or the CAP interview video. In addition, the evidence was sufficient for the jury to convict Mr. Brown of both sexual assault in the third degree and intentional abuse of a vulnerable adult.

[¶39] Affirmed.

---

[8] It is unclear whether Mr. Brown intends his argument regarding self-induced intoxication to apply to sexual assault in the third degree, but to the extent he does, his argument fails for the same reasons.