# THE SUPREME COURT, STATE OF WYOMING

# 2022 WY 110

APRIL TERM, A.D. 2022

September 9, 2022

JERALD THOMAS FALLON,

Appellant
(Defendant),

v.

S-21-0251

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Natrona County*
*The Honorable Daniel L. Forgey, Judge*

*Representing Appellant:*
    Office of Public Defender: Diane M. Lozano, State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; Robin S. Cooper, Senior Assistant Appellate Counsel. Argument by Ms. Cooper.

*Representing Appellee:*
    Bridget L. Hill, Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames*, Senior Assistant Attorney General; Donovan Burton, Assistant Attorney General. Argument by Mr. Burton.

* An Order Allowing Withdrawal of Counsel was entered on August 1, 2022.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FENN, Justice.**

[¶1]    Jerald Thomas Fallon was charged with second-degree murder.  A jury convicted him of the lesser-included offense of voluntary manslaughter.  He appeals his conviction and argues the district court erred when it instructed the jury on voluntary manslaughter.  He also contends the evidence was insufficient to sustain his conviction.  We affirm.

## ISSUES

[¶2]    Mr. Fallon presents two issues on appeal, which we state as follows:

> I.    Did the district court err when it instructed the jury on the lesser-included offense of voluntary manslaughter?
>
> II.    Was there sufficient evidence at trial to support Mr. Fallon's conviction of voluntary manslaughter?

## FACTS

[¶3]    Jerald Fallon and Kelly Black were in a dating relationship.  On February 29, 2020, Mr. Fallon and Ms. Black attended a company party at the Hilton Garden Inn in Casper, Wyoming.  The party was hosted by 71 Construction in a Hilton banquet room.  At the time, Mr. Fallon worked as a paving foreman for 71 Construction.  The party included dinner, drinks, and a comedy show with three acts.

[¶4]    Mr. Fallon and Ms. Black drove to the party in Ms. Black's vehicle, a Nissan Armada.  They arrived at the Hilton just before 5:00 p.m. and ordered drinks at the lobby bar.  During the course of the evening, Mr. Fallon and Ms. Black consumed several alcoholic drinks.  Mr. Fallon purchased and consumed between four and six rounds of shots. Ms. Black also consumed shots and at one point the bartender attending to the office party stopped serving Ms. Black because "she was drunk."

[¶5]    Witnesses testified that Ms. Black was "getting loud and obnoxious when the rest of the company was trying to watch [the comedy show]."  The Vice President of Operations for 71 Construction testified that she confronted Mr. Fallon after the first comedian's act and informed him Ms. Black and his table needed to settle down.  Ms. Black continued to disrupt the show during the second comedian.  Mr. Fallon grabbed her by the arm and screamed at her.

[¶6]    At 7:21 p.m., Mr. Fallon left the banquet room and went outside toward a smoking area.  Shortly thereafter, Ms. Black and a female attendee left the banquet room and went outside toward the same smoking area.  At 7:30 p.m., Mr. Fallon returned to the banquet

1

room. Approximately five minutes after Mr. Fallon left the smoking area, Ms. Black and the female attendee re-entered the hotel, went to the lobby bar, and ordered shots. While Ms. Black was at the bar, Mr. Fallon complained about her in text messages he sent to her daughter. The text message exchange is as follows:

> [Mr. Fallon at 7:36 p.m.]: I'm at my Christmas party and I'm sitting all by myself
>
> [Ms. Black's daughter at 7:37 p.m.]: Why??
>
> [Mr. Fallon at 7:38 p.m.]: Kelly has spilled 2 drinks on our table and I have no idea where she is right now 🙁 I'm sitting at our table all by myself
>
> [Ms. Black's daughter at 7:39 p.m.]: Is she like drunk-drunk? Try and find her and just tell her to come sit with you  Or tell her it's time to go
>
> [Mr. Fallon at 7:39 p.m.]: And she will never do shots with me and I caught her 2 times tonight doing shots with other guys I've sat her down 2 times and she keeps taking off

[¶7] After the text message exchange, Mr. Fallon left the banquet room and confronted Ms. Black at the lobby bar. The bartender testified Mr. Fallon "slammed his bottle on the bar, told [Ms. Black] he was done, he was leaving." She further testified the female attendee made a comment for Mr. Fallon to come have a drink with them, and Mr. Fallon responded, "shut the f*** up, b****; I don't even know you."

[¶8] At 7:43 p.m., Mr. Fallon exited the hotel and based on the Hilton surveillance video, he moved Ms. Black's vehicle closer to the exit near the banquet room. He re-entered the hotel through the main entrance and walked by the lobby bar. His demeanor caught the attention of the bartender and another bar patron. The bartender left the bar and followed Mr. Fallon toward the banquet room.

[¶9] At 7:45 p.m., Mr. Fallon exited the banquet room with Ms. Black. The bartender testified, Mr. Fallon was angry and "had [Ms. Black] by the arm" when they left. She stated "[Ms. Black] was running beside [Mr. Fallon] almost" and "he was stomping out of [the banquet room]" holding her by the arm "like with a kid when they don't want to leave."

[¶10] Based on a review of the Hilton surveillance video, Mr. Fallon and Ms. Black exited the Hilton from the side door by the banquet room and walked toward the passenger side of the Nissan Armada. The video does not show whether Ms. Black got into the Nissan, but it does show Mr. Fallon walked around the front of the Nissan from the passenger side

2

to the driver side, without Ms. Black. The lead investigator, Kevin Jividen with the Natrona County Sheriff's Office, testified the surveillance video showed "the Nissan Armada back[ed] up at a very quick pace and . . . pull[ed] away very speedily." Approximately three minutes later, Mr. Fallon called Ms. Black's daughter. Ms. Black's daughter testified Mr. Fallon stated he got into an argument with Ms. Black and she "got[] out of the vehicle . . . and had taken off" without her phone and wallet.

[¶11] Surveillance video from Racks Gentlemen's Club showed Mr. Fallon walked into the establishment and paid a cover charge approximately ten minutes after leaving the Hilton, at 8:00 p.m. Around this same time, Ms. Black's daughter called the Casper Public Safety Communication Center for a welfare check on Ms. Black. Through a text message, Ms. Black's daughter notified Mr. Fallon she called law enforcement. The following text message exchange occurred between Ms. Black's daughter and Mr. Fallon from 8:11 p.m. to 8:23 p.m.:

> [Ms. Black's daughter at 8:11 p.m.]: I called the cops and they're gonna send someone out to find [Ms. Black] and probably stick her in the drunk tank.
>
> [Mr. Fallon at 8:18 p.m.]: What? Are you serious
>
> [Ms. Black's daughter at 8:19 p.m.] Yeah cause it's supposed to snow and I don't want her to freeze or get hurt
>
> [Mr. Fallon at 8:19 p.m.]: I'll go back and find her
>
> [Ms. Black's daughter at 8:19 p.m.]: Well if you've been drinking then I don't recommend you getting pulled over.
>
> [Mr. Fallon at 8:20 p.m.]: I'll take the risk
>
> [Ms. Black's daughter at 8:20 p.m.]: Be careful
>
> [Mr. Fallon at 8:20 p.m.]: I will
>
> [Ms. Black's daughter at 8:21 p.m.]: Okay let me know if you find her
>
> [Mr. Fallon at 8:23 p.m.]: Ok

[¶12] Mr. Fallon left Rack's Gentlemen's Club at 8:21 p.m. At 8:25 p.m., the traffic camera at the US 20-26 Bypass and Interstate 25 interchange captured a pedestrian, believed to be Ms. Black, walking on the east side of the interstate. At 8:31 p.m., Mr.

3

Fallon attempted to make several outgoing phone calls to Ms. Black's daughter. One call went through, and Mr. Fallon had a conversation with Ms. Black's daughter that lasted approximately one minute and sixteen seconds. Ms. Black's daughter testified Mr. Fallon stated "I just hit your mom. I just hit your mom. You need to get here." She stated Mr. Fallon "sounded very freaked out and serious."

[¶13]  At 8:36 p.m., an eyewitness called dispatch and reported seeing a silver Nissan Armada with a broken passenger taillight pulled over to the side of the road at the bypass and Interstate 25 interchange. He testified he drove past the vehicle and witnessed a man—later identified as Mr. Fallon—running off in the field. The eyewitness thought Mr. Fallon hit an animal, so he turned around to help. The eyewitness pulled behind the vehicle, observed Mr. Fallon dragging a woman toward the Nissan, and throwing her into the vehicle. He noticed the woman's legs sticking out of the vehicle with no movement, and Mr. Fallon shutting her legs in the door. The eyewitness asked Mr. Fallon if he needed help, but Mr. Fallon waved him off and drove away "like he was trying to get out of there."

[¶14]  The eyewitness noticed personal items on the ground, so he followed Mr. Fallon to the Hilton parking lot. He testified Mr. Fallon drove normally and did not swerve. He further stated he heard Mr. Fallon yelling when their vehicles passed each other in the parking lot. The eyewitness requested dispatch to send a police officer to the Hilton because the Nissan he had been following, containing the motionless passenger, was parked on the north side of the parking lot facing the event center. While on the phone with dispatch, the eyewitness saw Mr. Fallon get out of the driver's side of the vehicle, walk over to the passenger's side, and then return to the driver's side of the vehicle a couple of times.

[¶15]  At 8:42 p.m., Nicholas Moore, a police officer employed by the City of Casper, arrived at the Hilton. The eyewitness testified Mr. Fallon left the vehicle and took off running when law enforcement arrived. Around this same time, at 8:46 p.m., Ms. Black's daughter called Mr. Fallon. She asked where she needed to go, and he informed her to go to the Hilton, but that he had left.

[¶16]  Officer Moore found the Nissan on the north side of the Hilton parking lot and when he walked up to the Nissan, he saw Ms. Black slumped over and unresponsive in the passenger side of the vehicle. Ms. Black was not wearing a shirt, had bruising on her back, and did not appear to be alert. Ms. Black was not breathing, so Officer Moore and his partner performed cardiopulmonary resuscitation. At 8:57 p.m., an ambulance transported Ms. Black to the emergency room, and at 9:27 p.m., less than two hours after leaving the party, she was pronounced dead.

[¶17]  That evening officers went to the accident scene, where they observed a debris field comprised of the taillights of a vehicle, vehicle tracks, items of clothing, female-style shoes, sunglasses, one sock, blood droplets, and a 45-foot drag mark in the dirt. One piece

4

of clothing found near the drag marks was a shirt inside a jacket. The jacket was forensically examined and tested positive for human blood. The deoxyribonucleic acid ("DNA") profile obtained from the jacket tested consistent with Ms. Black's DNA. The sunglasses were also forensically tested and revealed a DNA profile consistent with Mr. Fallon's DNA.

[¶18] Jason Sawdon, a Wyoming Highway Patrol State Trooper certified in accident reconstruction, testified the evidence indicated Mr. Fallon hit Ms. Black with the Nissan in the emergency lane, approximately two feet from the dirt side of the roadway. Trooper Sawdon found tire marks at the accident scene, which matched the Nissan's tire tread. He testified the tire tracks showed Mr. Fallon drove the Nissan in reverse when he struck Ms. Black. He opined the Nissan was traveling in reverse at "38 to 42 miles an hour at impact." He concluded the distance the Nissan would have covered to accelerate from 0 to 38 or 0 to 42 miles an hour is "136 feet or 167 feet, respectively." Trooper Sawdon testified the evidence indicated the Nissan's brake light was not active at the time of impact and there was no evidence of brake marks at the scene.

[¶19] Trooper Sawdon further observed a clothing pattern transfer, which occurs when there is an impact or contact between two things. He opined for a clothing pattern transfer to occur the impact must "be pretty forceful and short in duration." During his investigation, he compared the embroidery pattern on the back pocket of Ms. Black's jeans to the pattern transferred to the back bumper of the Nissan. He found the clothing pattern on the rear passenger side bumper matched the clothing pattern on the back pocket of Ms. Black's jeans. Trooper Sawdon opined Mr. Fallon launched Ms. Black approximately 76 feet when he struck her with the vehicle.

[¶20] Thomas Bennett, a physician and forensic pathologist, performed an autopsy on Ms. Black. He opined Ms. Black's cause of death was "the blunt traumatic injuries, with the internal blood loss, exsanguination, due to being struck as a pedestrian by a motor vehicle." He opined the injuries Ms. Black sustained "went from . . . bruises and abrasions of her back to much more significantly the internal injuries where she fractured . . . ribs, 2 through 9, on the right side of her spine and then tore her aorta . . . where she bled out massively." He further opined Ms. Black's injuries indicated she was struck from behind with the primary impact to her back.

[¶21] Two days after Mr. Fallon struck Ms. Black, on March 2, 2020, law enforcement located him at a coworker's home. The coworker testified Mr. Fallon showed up to his home around midnight the night of the party and stated he got into an argument with Ms. Black. Mr. Fallon stayed at the coworker's residence until law enforcement arrived. He was taken into custody and arrived at the Natrona County Sheriff's Office wearing the same clothing he wore to the party.

[¶22] The State charged Mr. Fallon with two felonies: Count 1, second-degree murder;

and Count 2, aggravated assault and battery. It further sought a habitual criminal sentencing enhancement of life under Wyoming Statute § 6-10-201(b)(ii). A six-day jury trial was held beginning on March 17, 2021.

[¶23] During the trial, the district court provided the parties with draft jury instructions on the lesser-included offense of voluntary manslaughter. The district court inquired into the parties' positions on whether to give the lesser-included offense instructions. The State requested the jury instructions and Mr. Fallon objected. Mr. Fallon's counsel argued the evidence did not support giving the lesser-included offense instructions because there was no evidence for the jury to infer Mr. Fallon acted upon a sudden heat of passion. Over Mr. Fallon's objection, the district court granted the State's request and held the circumstances and manner under which Mr. Fallon and Ms. Black left the party, and the manner in which the collision occurred, when viewed in favor of the State, supported giving the lesser-included offense instructions.

[¶24] The jury acquitted Mr. Fallon of second-degree murder and found him guilty of the lesser-included offense of voluntary manslaughter. It also found Mr. Fallon guilty of Count 2, aggravated assault and battery. During the habitual criminal portion of the trial, the jury found Mr. Fallon qualified for the sentencing enhancement. The district court sentenced Mr. Fallon to life sentences on the voluntary manslaughter conviction and the aggravated assault conviction, both to run concurrently. Mr. Fallon timely appealed.

## STANDARD OF REVIEW

[¶25] When the State requests a lesser-included offense instruction and the defendant objects, the district court's decision is subject to de novo review. *See generally Jacobs v. State*, 2021 WY 104, ¶ 10, 495 P.3d 303, 308 (Wyo. 2021) (reviewing the district court's decision de novo when the defendant requested a lesser-included offense instruction); *State v. Keffer*, 860 P.2d 1118, 1137–40 (Wyo. 1993) (reviewing the district court's denial of the State's request for a lesser-included offense instruction de novo). "A crime is a lesser-included offense if it meets the statutory elements test, meaning that its elements 'are a subset of the elements of the charged offense.'" *Jacobs*, ¶ 11, 495 P.3d at 308 (quoting *Nickels v. State*, 2015 WY 85, ¶ 14, 351 P.3d 288, 291 (Wyo. 2015)). First, a court must determine if an offense meets the statutory elements test, and then it must "determine whether the evidence supports giving a lesser-included offense instruction." *Id.* The quantum of evidence required to support a jury instruction on a lesser-included offense is minimal. *Id.* In reviewing whether there is minimal evidence to support the district court's decision to give a lesser-included offense instruction, we view the evidence in the light most favorable to the party requesting the instruction. *Warren v. State*, 835 P.2d 304, 330–31 (Wyo. 1992) (Urbigkit, C.J., dissenting) ("When the trial court refuses to give an instruction on the lesser included offense, the appellate court must view the evidence supporting the lesser included offense in the light most favorable to the party requesting the instruction."); *Dean v. State*, 2003 WY 128, ¶ 13, 77 P.3d 692, 697 (Wyo. 2003)

6

(holding when the defendant requests a lesser-included offense instruction the court "should view the evidence in the light most favorable to the accused" when "deciding whether to give a lesser-included offense instruction"); *Keffer*, 860 P.2d at 1134–40 (finding the defendant and State are equally entitled to request a lesser-included offense instruction).

[¶26] "When reviewing a claim that the evidence was insufficient to support a jury's verdict in a criminal trial, we decide whether the evidence could reasonably support the jury's verdict." *Neidlinger v. State*, 2021 WY 39, ¶ 22, 482 P.3d 337, 344 (Wyo. 2021). "We do not consider 'whether or not the evidence was sufficient to establish guilt beyond a reasonable doubt, but instead whether or not the evidence could reasonably support such a finding by the factfinder.'" *Cotney v. State*, 2022 WY 17, ¶ 9, 503 P.3d 58, 63 (Wyo. 2022) (quoting *Mraz v. State*, 2016 WY 85, ¶ 19, 378 P.3d 280, 286 (Wyo. 2016)).

> This Court examines the evidence in the light most favorable to the State. We accept all evidence favorable to the State as true and give the State's evidence every favorable inference which can reasonably and fairly be drawn from it. We also disregard any evidence favorable to the appellant that conflicts with the State's evidence.

*Id.* (quoting *Birch v. State*, 2018 WY 73, ¶ 25, 421 P.3d 528, 536 (Wyo. 2018)). "We will not reweigh the evidence nor will we re-examine the credibility of the witnesses." *Brown v. State*, 2019 WY 102, ¶ 27, 450 P.3d 208, 214 (Wyo. 2019). "We do not substitute our judgment for that of the jury; rather" "we defer to the jury as the fact-finder and assume they believed only the evidence adverse to the defendant since they found the defendant guilty beyond a reasonable doubt." *Neidlinger*, 2021 WY 39, ¶ 22, 482 P.3d at 344 (quoting *Gore v. State*, 2019 WY 110, ¶ 9, 450 P.3d 1251, 1253 (Wyo. 2019)); *Brown*, 2019 WY 102, ¶ 27, 450 P.3d at 214 (quoting *Oldman v. State*, 2015 WY 121, ¶ 5, 359 P.3d 964, 966 (Wyo. 2015).

## DISCUSSION

[¶27] The jury acquitted Mr. Fallon on the charge of murder in the second degree and convicted him of the lesser included offense of voluntary manslaughter. Mr. Fallon challenges the district court's decision to instruct the jury on voluntary manslaughter and contends there was not the minimal evidentiary support necessary to show he acted in a sudden heat of passion. He further argues the evidence is insufficient to support the jury's verdict.

[¶28] Second-degree murder is the killing of any human being "purposely and maliciously, but without premeditation." Wyo. Stat. Ann. § 6-2-104(a) (LexisNexis 2019). Voluntary manslaughter is the unlawful killing of any human being without malice, express

or implied, voluntarily, upon a sudden heat of passion. Wyo. Stat. Ann. § 6-2-105(a)(i) (LexisNexis 2019). A defendant charged with second-degree murder may be found guilty of the lesser-included offense of voluntary manslaughter. *See* W.R.Cr.P. 31(c) (LexisNexis 2021) ("The defendant may be found guilty of an offense necessarily included in the offense charged."); *Keffer*, 860 P.2d at 1139 ("We hold, therefore, that the crime of voluntary manslaughter is a lesser included offense of the crime of second degree murder."). The district court should instruct the jury on the lesser-included offense of voluntary manslaughter "if there are in dispute factual issues that would permit a jury rationally to find the defendant guilty of [voluntary manslaughter] and acquit the defendant of [second-degree murder]." *Jacobs*, 2021 WY 104, ¶ 11, 495 P.3d at 308; *Thomas v. State*, 2003 WY 53, ¶ 13, 67 P.3d 1199, 1202–03 (Wyo. 2003) ("The failure to give a lesser-included offense instruction when such an offense exists and the evidence presented would support conviction of that offense constitutes reversible error."); *Mueller v. State*, 2001 WY 134, ¶ 9, 36 P.3d 1151, 1155–56 (Wyo. 2001) ("[A] trial court may, and sometimes should, give [a lesser-included offense] instruction without request from either party.").

[¶29] To reduce second-degree murder to voluntary manslaughter, there must be some evidence the defendant killed his victim, without malice, in the sudden heat of passion engendered by an adequate provocation from the victim. *See generally Jacobs*, 2021 WY 104, ¶¶ 13–14, 495 P.3d at 308–09 ("[V]oluntary manslaughter is an intentional killing in the heat of passion as a result of severe provocation."); *Schmuck v. State*, 2017 WY 140, ¶¶ 29–30, 406 P.3d 286, 296–97 (Wyo. 2017) (discussing the malice element for murder is mutually exclusive to sudden heat of passion in voluntary manslaughter); 40 C.J.S. *Homicide* § 112 (August 2022 Update) ("[A]n intentional homicide may be reduced from murder to manslaughter only where it was committed in a sudden heat of passion caused by adequate provocation.").

> "Heat of passion" means such passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same or similar circumstances as those in question which would cause him to act rashly, without reflection or deliberation, and from passion rather than from judgment. The heat of passion must be aroused suddenly, and the act resulting in death must occur while the defendant was acting under the direct and immediate influence of such heat of passion, and before sufficient time has elapsed to permit the heat of passion to cool.

*Jacobs*, ¶ 13, 495 P.3d at 308–09 (quoting *Farrow v. State*, 2019 WY 30, ¶ 35, 437 P.3d 809, 820 (Wyo. 2019)).

[¶30] We previously recognized it is reversible error when the factual dispute at trial centers on the defendant's intent and the district court denies the State's request to instruct

the jury on the lesser-included offense, despite minimal evidence supporting the instruction. *Keffer*, 860 P.2d at 1139–40. In *Keffer*, we held there were disputed issues of fact surrounding the defendant's intent which would permit a jury to rationally find the defendant guilty of voluntary manslaughter and acquit on the second-degree murder charge. *Id.* We explained:

> [T]he central factual dispute at Keffer's trial was her intent. She admitted firing the gun at Jackson and killing him. If the jury accepted all of the State's evidence, the killing was committed with malice. If the jury accepted Keffer's evidence, she acted in self defense, and the homicide was justifiable. A middle ground, however, is easily seen. If the jury questioned the credibility of the co-employee's testimony, which was strongly attacked by the defense during cross-examination, then the presence or absence of malice became an open question. Furthermore, the jury heard Keffer testify that she was "scared" as she withdrew the gun from a bedroom dresser. Keffer's husband, also testified that Keffer was afraid. **The jury was entitled to weigh such fear to determine if it was of "such a character or degree as to render the accused incapable of cool reflection" thus reducing a second degree homicide to manslaughter.**

*Id.* at 1139 (citations omitted) (emphasis added).

[¶31] The central factual dispute at trial was Mr. Fallon's intent. Mr. Fallon did not deny hitting Ms. Black with the vehicle. Instead, he claimed it was a tragic accident. Mr. Fallon's trial counsel argued the jury should acquit Mr. Fallon on second-degree murder and voluntary manslaughter because there was no evidence of purpose, malice, recklessness that rose to a level of indifference to Ms. Black's life, or sudden heat of passion. The State argued the evidence showed Mr. Fallon was guilty of second-degree murder because he acted maliciously, and his actions were indicative of an extreme indifference to the value of human life. It argued Mr. Fallon put a car in reverse and accelerated at a high rate of speed for 137 feet knowing Ms. Black was behind the vehicle, which is not indicative of a sudden heat of passion. The State further argued Mr. Fallon did not act upon a sudden heat of passion because 45 minutes elapsed before he intentionally hit Ms. Black with his vehicle.

[¶32] The record supports the jury's verdict of voluntary manslaughter, which is a middle ground between Mr. Fallon's theory of the case and the State's theory of the case. "[T]he hallmark of heat of passion [or voluntary manslaughter] is taking action upon impulse without reflection." 40 C.J.S. *Homicide* § 112. "The 'sudden heat of passion' contemplated by our voluntary manslaughter statute is descriptive of just such a state of mind, and it may

occur from any emotional excitement of such intensity that it temporarily obscures reason, or leaves the mind bereft of reason." *Keffer*, 860 P.2d at 1139 (quoting *State v. Helton*, 276 P.2d 434, 442 (Wyo. 1954)). "The actor, to be in the heat of passion, must be experiencing an intense or vehement emotional excitement of the kind that would prompt violent and aggressive action." 40 C.J.S. *Homicide* § 112. The emotional excitement involved in the crime of voluntary manslaughter is generally rage, anger or resentment produced by a provocation from the victim. 2 Wayne R. LaFave, *Substantive Criminal Law* § 15.2(a) (3d ed. 2021); *Cf.* 2 Jens David Ohlin, *Wharton's Criminal Law* § 22:4 (16th ed. Sept. 2022 Update) ("Passion is not limited to anger, rage, or resentment. It may include fear, terror, or, according to some cases, 'excitement' or 'nervousness.'").

[¶33] "[I]n all cases, civil or criminal, turning upon the state of an individual's mind, direct evidence may be rare; usually the trier of facts is required to draw inferences of the state of mind at issue from surrounding acts, utterances, writings, or other indicia." *Bruce v. State*, 2015 WY 46, ¶ 66, 346 P.3d 909, 929 (Wyo. 2015) (quoting *Benjamin v. State*, 2011 WY 147, ¶ 46, 264 P.3d 1, 12 (Wyo. 2011)). Here, the surrounding facts and circumstances support an inference Mr. Fallon killed Ms. Black voluntarily in a heat of passion. During the comedy show, Ms. Black was loud, disruptive, and spilled her drink on multiple occasions. The individuals sitting at Mr. Fallon's table left because they felt uncomfortable and embarrassed and wanted to disassociate from Mr. Fallon and Ms. Black. Around this same time, the Vice President of Operations at Mr. Fallon's employment, approached Mr. Fallon and indicated Ms. Black was being disruptive and his table needed to settle down.

[¶34] After the interaction, Ms. Black was still disruptive, so Mr. Fallon grabbed her by the arm and screamed "shut the f*** up." Witnesses testified Mr. Fallon looked upset and that his demeanor through the night suggested he was embarrassed, jealous, and upset by Ms. Black's actions. Shortly after Mr. Fallon screamed at Ms. Black, a female attendee encountered her in the bathroom. Ms. Black indicated she was in trouble and afraid to get in a car with Mr. Fallon. Around this same time, Mr. Fallon text messaged Ms. Black's daughter that Ms. Black kept taking off and he was sitting all by himself. He further stated he caught Ms. Black doing shots with other guys, but she would not do shots with him.

[¶35] Within seconds of sending this text message, Mr. Fallon confronted Ms. Black sitting at the bar with the female attendee. He slammed his beer bottle down, leaned in closely to Ms. Black's face, and stated he was done and leaving. The surveillance video showed Mr. Fallon walked away then stopped and pointed at Ms. Black and the female attendee. The bartender testified Mr. Fallon stated to the female attendee, "shut the f*** up, b****; I don't even know you." Mr. Fallon's demeanor garnered the attention of other people around him, including the bartender. His behavior prompted the bartender to follow him back to the banquet room.

[¶36] When Mr. Fallon left the Hilton, he had Ms. Black by her arm and was pulling her out the door. The investigating officer testified it appeared Mr. Fallon was walking at a

fast enough pace that Ms. Black had difficulty keeping up. The bartender testified Mr. Fallon stomped out of the banquet room and was angry. She stated Mr. Fallon had Ms. Black "by the arm" as "she was running to keep up."

[¶37] Approximately four minutes after Mr. Fallon and Ms. Black left, Mr. Fallon called Ms. Black's daughter. He told her that he got into an argument with Ms. Black, and she left the vehicle without her phone and wallet. Mr. Fallon said, "he was so done and that he was going to go do his own thing for a bit and then would be back home that night to pick up his stuff." At 8:11 p.m., Ms. Black's daughter sent a message to Mr. Fallon stating she called law enforcement to find Ms. Black. Mr. Fallon responded, "are you serious," but also messaged he would go find her. Ms. Black's daughter testified she interpreted Mr. Fallon's response as "surprised or maybe angry." Less than forty-five minutes after last seeing Ms. Black, he struck her with a vehicle.

[¶38] Mr. Fallon argues "[w]hile [he] could have been . . . in a heat of passion earlier in the evening, he had a cooling off period and there was no evidence to suggest . . . that he was acting in the sudden heat of passion" "when he struck Ms. Black." He contends "[h]is absence from Ms. Black and break from their argument was at least thirty minutes" and therefore is not indicative he acted in a heat of passion. *See* 40 C.J.S. Homicide § 115 (Aug. 2022 Update) ("It has been held that where the alleged provocation is followed by at least a few minutes during which the defendant and the victim are separated, and then the defendant seeks out the victim, a charge of voluntary manslaughter based on provocation is not warranted.").

[¶39] If the killing occurred "before sufficient time had elapsed for the accused's temper to cool, the killing is manslaughter." 40 Am. Jur. 2d *Homicide* § 55 (Aug. 2022 Update). The question before us then is whether there is sufficient evidence to reasonably support Mr. Fallon's suspension of reason continued from the time of Ms. Black's provocation until he hit her with her vehicle. *See* 40 Am. Jur. 2d *Homicide* § 55. There is no precise time frame to indicate a sufficient time for a temper to cool. 40 C.J.S. *Homicide* § 115. "What constitutes a reasonable cooling time in a particular case depends upon the nature of the provocation and the circumstances surrounding its occurrence—a matter to be determined by the jury as a question of fact." 2 Wayne R. LaFave, *Substantiative Criminal Law* § 15.2(d) (3d ed. Dec. 2021 Update); *see also State v. Flory*, 276 P. 458, 464 (Wyo. 1929) ("We think, however, that the weight of authority is that, in cases like that at bar, the question of cooling time depends on the circumstances and is ordinarily one for the jury."). We analyze the surrounding facts and circumstances to determine whether the evidence reasonably supports the jury's finding. *Bruce*, 2015 WY 46, ¶¶ 63–68, 346 P.3d at 929–30 (reviewing the evidence before and after the killing—though the original provocation took place more than eight hours before—to determine if there is sufficient evidence to support the jury's guilty verdict of the lesser-included offense of voluntary manslaughter).

[¶40] The evidence leading up to Ms. Black's death, and Mr. Fallon's actions after the

11

assault, reasonably support a sufficient time had not elapsed for Mr. Fallon's temper to cool and reason to resume. The nature of the wounds suffered by the victim and evidence the defendant was upset with the victim can provide sufficient evidence to support an inference the defendant acted with a sudden heat of passion. *Robinson v. State*, 11 P.3d 361, 368–69 (Wyo. 2000). Mr. Fallon accelerated the vehicle in reverse on dry roads for 136 to 167 feet and reached a speed of 38 to 42 miles per hour when he struck Ms. Black with the vehicle. The physical evidence indicated Mr. Fallon never braked before hitting Ms. Black. The amount of force and speed from the vehicle launched Ms. Black approximately 76 feet.

[¶41] Ms. Black's cause of death was "the blunt traumatic injuries" from being struck with significant force by a vehicle. When Mr. Fallon struck Ms. Black with the Nissan, she was "facing away from the [vehicle and] [t]he primary area of impact was to her right back." The autopsy revealed she was hit with considerable force because her clothing left an abrasion pattern, meaning "the clothing [was] literally forced into the skin surface" on the area of impact—her lower right back. The impact caused Ms. Black to lose three quarts of blood into her chest cavity and bleed out internally. Prior to the crash, Ms. Black had a healthy elastic aorta, and as a result of the crash, her aorta was "torn completely in half," with the edges separating about an inch. It was this damage to the aorta and the extensive internal bleeding that ultimately led to her death. The amount of force from the vehicle broke eight of twelve ribs on her right side. This caused tearing in the lining of the inside of her chest wall and damage to her lungs. The forensic pathologist testified the amount of force necessary to fracture this many ribs is roughly equivalent to falling five stories and landing flat on your back.

[¶42] After striking Ms. Black with the vehicle, Mr. Fallon called Ms. Black's daughter and stated "I just hit your mom. I just hit your mom. You need to get here." Ms. Black's daughter testified Mr. Fallon "sounded very freaked out and serious." An eyewitness called 911 after observing the Nissan pulled over with no flashing lights, the taillights damaged, and someone running off into the field. He observed Mr. Fallon drag a female to a silver Nissan Armada, throw her into the vehicle, and shut the door on the female's legs. The length of the drag marks at the accident scene was 45 feet. The eyewitness testified Mr. Fallon declined his offer of help and instead left the scene of the accident. He further observed Mr. Fallon yelling when their vehicles passed each other in the parking lot. When law enforcement arrived, Mr. Fallon ran. Several hours later, he showed up to a coworker's home. The coworker testified he asked Mr. Fallon why he came to his home, and Mr. Fallon responded that he and Ms. Black got into an argument.

[¶43] From this evidence, the jury could reasonably conclude Mr. Fallon acted without malice, and in a sudden heat of passion when he killed Ms. Black. The surrounding facts and circumstances, and reasonable inferences drawn from them, sufficiently support Mr. Fallon was acting in a heat of passion produced by his perception of Ms. Black's actions when he voluntarily struck her with her own vehicle. The evidence and reasonable

12

inferences further support sufficient time had not lapsed for Mr. Fallon's passion to cool and his reason to resume. We find there is sufficient evidence to support the jury's verdict, which also meets the minimal evidence necessary to instruct the jury on the lesser-included offense of voluntary manslaughter. Therefore, we find no further analysis is needed.

## CONCLUSION

[¶44] We find the record supports the minimal evidence necessary to instruct the jury on the lesser-included offense of voluntary manslaughter. We find no error in the district court's decision. We further find the evidence was sufficient to support the jury's guilty verdict on the lesser-included offense of voluntary manslaughter. We affirm on both issues raised by Mr. Fallon.